# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CERTISIGN HOLDING, INC., a Delaware corporation, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 12055-VCS** |
| | : | |
| SERGIO KULIKOVSKY, | : | |
| | : | |
| Defendant. | : | |
| ------------------------------------------------- | : | |
| SERGIO KULIKOVSKY and SK INERNATIONAL HOLDINGS, LLC, | : | |
| | : | |
| | : | |
| Counterclaim Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CERTISIGN HOLDING, INC., a Delaware corporation, | : | |
| | : | |
| Counterclaim Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted: March 12, 2018
Date Decided: June 7, 2018

Michael A. Pittenger, Esquire, Jaclyn C. Levy, Esquire, Jay G. Stirling, Esquire and Tyson J. Prisbrey, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Plaintiff and Counterclaim Defendant CertiSign Holding, Inc.

David J. Margules, Esquire, Elizabeth A. Sloan, Esquire and Suzanne O. Lufadeju, Esquire of Ballard Spahr LLP, Wilmington, Delaware, and William B. Igoe, Esquire of Ballard Spahr LLP, Philadelphia, Pennsylvania, Attorneys for Defendant and Counterclaim Plaintiffs Sergio Kulikovsky and SK International Holdings, LLC.

**SLIGHTS, Vice Chancellor**

John D. Rockefeller is quoted as saying, "a friendship founded on business is a good deal better than a business founded on friendship."[1] And so it was for three friends who formed a network of entities to do business in the internet protocol and security space. After a period of some success, the business began to falter and, ultimately, the business partners fell out. Verbal and physical skirmishes ensued. Whatever business sense the friends brought with them into the venture was replaced by shortsighted bitterness and vindictiveness. The partners behaved badly. Litigation inevitably followed. As it turns out, some of the bad behavior amounted to actionable wrongdoing. Because one of the entities at the center of the business relationship, CertiSign Holding, Inc. ("CertiSign" or the "Company"), is a Delaware corporation, the litigation landed in this Court.

The parties are CertiSign as plaintiff and counterclaim defendant on one side, and a former director of CertiSign, Sergio Kulikovsky ("Kulikovsky"), and his wholly-owned entity, SK International Holdings, LLC ("SK Holdings") as defendant (Kulikovsky) and counterclaim plaintiffs (Kulikovsky and SK Holdings) on the other.[2] The events leading to this litigation began in 2005, when CertiSign underwent a reorganization. In connection with the 2005 reorganization, CertiSign

_____

[1] John D. Rockefeller, *Random Reminiscences of Men and Events* (Doubleday 1909) (actually attributing the quote to his business partner Henry Flagler).

[2] Although SK Holdings is not a defendant, for simplicity's sake, I refer to Kulikovsky and SK Holdings collectively as "Defendants."

1

issued a substantial amount of stock. Approximately three years later, in 2008, Kulikovsky, who had been serving as CEO of the operating company, resigned from that position after his business partners expressed a preference for a professional manager to serve as CEO. By then, the disintegration of the trio's friendship and business relationship was brewing. Four years later, in 2012, as the parties began to explore a potential sale of CertiSign, it was discovered that the stock issued in connection with the 2005 reorganization had been issued before CertiSign's amended and restated certificate of incorporation was filed with the appropriate authorities. Consequently, CertiSign's outside legal advisors opined that because the vast majority of CertiSign's outstanding stock (as issued in the reorganization) was defective, the subsequent vote to elect its board of directors had also been defective and all actions taken thereafter by the pseudo board were invalid.

CertiSign sought to remedy these structural defects with certain self-help steps devised by its counsel. At the time the defects were discovered, Kulikovsky was one of two CertiSign directors in office who had been a director both before and after the reorganization. Accordingly, CertiSign needed Kulikovsky to sign certain consents to remedy the capital structure defects. But, by then, Kulikovsky's relationship with his former friends and current business partners had soured. In response to the request for his assistance in restoring CertiSign's capital structure, Kulikovsky declared that he would not sign the consents unless CertiSign and certain

of its stockholders acceded to several demands. These demands included (1) dissolving CertiSign's controlling stockholder, in which SK Holdings holds stock, so that Kulikovsky could vote the CertiSign shares he contributed to CKS directly, and (2) requiring another CertiSign director to repay Kulikovsky a personal loan owed to Kulikovsky. CertiSign did not give in to Kulikovsky's demands and Kulikovsky never signed the consents. This, in turn, entirely shut down CertiSign's self-help efforts.

In a separate action, the Court granted relief to CertiSign under 8 *Del. C.* § 205, over Kulikovsky's opposition, by entering an order validating the stock issued in the reorganization.[3] Having prevailed in the Section 205 action, CertiSign then initiated this action in which it alleges Kulikovsky breached his fiduciary duty of loyalty to CertiSign by refusing to sign the self-help documents unless CertiSign gave into his self-interested demands. CertiSign seeks damages, attorneys' fees and expenses. In riposte, Kulikovsky and SK Holdings have pressed counterclaims against CertiSign in which Kulikovsky seeks to compel CertiSign to grant stock options to him that allegedly were promised but never delivered, and SK Holdings seeks to compel CertiSign to repay a loan that CertiSign allegedly assumed on behalf

---

[3] *In re CertiSign Hldg., Inc.*, 2015 WL 5136226 (Del. Ch. Aug. 31, 2015); *In re CertiSign Hldg., Inc.*, 2015 WL 5786138, at *1 (Del. Ch. Oct. 2, 2015) (ORDER).

3

of its indirectly-held, wholly-owned subsidiary (related to, but separate from, the personal loan owed to Kulikovsky).

In this post-trial Memorandum Opinion, I conclude that (1) Kulikovsky breached his fiduciary duty of loyalty to CertiSign by refusing to cooperate with the self-help for solely personal reasons; (2) Defendants did not prove that CertiSign granted Kulikovsky options; and (3) Defendants did not prove that CertiSign assumed the debt owed to SK Holdings by CertiSign's indirectly-held, wholly-owned subsidiary. I also award CertiSign some attorneys' fees and expenses as damages. My reasoning follows.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' pre-trial stipulation, evidence admitted at trial and those matters of which the Court may take judicial notice.[4] The trial record consists of 431 joint trial exhibits, 990 pages of trial testimony and eight lodged depositions. The following facts were proven by a preponderance of the competent evidence.

---

[4] I cite to the Joint Pre-Trial Stipulation and Order as "PTO ¶"; to the joint trial exhibits as "JX #"; to the trial transcript as "Tr. # (witness name)"; and to the transcript of the Oral Argument on Defendants' and Counterclaim Plaintiffs' Motion to Strike and Post-trial Oral Argument as "OA Tr. #."

## A. Parties and Relevant Non-Parties

Plaintiff/Counterclaim Defendant, CertiSign, is a Delaware corporation formed in December 2004 by non-party Certipar, S.A. ("Certipar"), a Brazilian corporation, to act as a holding company for Certipar.[5] CertiSign has four stockholders: (1) CKS Holding, Inc. ("CKS"); (2) Darby Technology Ventures ("Darby"), a mutual fund; (3) Intel Capital Corporation ("Intel"); and (4) GeoTrust Inc.[6]

Non-party, Certipar, functions solely as the parent of its indirect, wholly-owned subsidiary, CertiSign Certificadora Digital S.A. ("CertiSign Brazil").[7] Non-party, CertiSign Brazil, is a Brazilian corporation based in São Paulo, Brazil.[8] It is an operating company that provides public key infrastructure-based solutions to financial institutions, governments and enterprises that utilize unsecured internet protocol networks to link business processes, exchange information and conduct banking and commerce transactions.[9] CertiSign Brazil also provides a variety of

---

[5] PTO ¶ 4.

[6] JX 500; PTO ¶ 9.

[7] PTO ¶ 4. In December 2014, Fundo de Investimento em Participações Bordeaux ("FIP"), a Brazilian private equity fund, acquired 100% of the shares of CertiSign Brazil. *Id.* At the same time, Certipar acquired 100% of the shares of FIP. *Id.*

[8] PTO ¶ 5.

[9] *Id.*

security and consulting services ranging from digital certificates, authentication and managed digital identity.[10]

Defendant/Counterclaimant, Kulikovsky, served as a director and president of CertiSign from the Company's inception until 2013.[11] He also served as Chief Executive Officer ("CEO") of CertiSign Brazil from 2002 until his forced resignation in 2008.[12] He is an officer, director and the 100% owner of SK Holdings, a Delaware limited liability company.[13] Kulikovsky is a resident of Brazil.[14]

Non-party, Nicola Cosentino ("Cosentino"), is the vice president, secretary and treasurer of CertiSign.[15] He, along with Kulikovsky and non-party, Edgar Safdie, served as directors of CertiSign at the time of its formation.[16] Cosentino is also a business development consultant at CertiSign Brazil, and his

---

[10] *Id.*

[11] PTO ¶ 6.

[12] *Id.*

[13] PTO ¶¶ 6–7.

[14] PTO ¶ 6.

[15] Tr. 691–92 (Cosentino).

[16] Tr. 697 (Cosentino). Kulikovsky, Cosentino and Edgar Safdie, each representing a family enterprise, began the CertiSign venture as friends. As discussed below, the friendship gave way under the weight of a struggling business and the self-interested decision-making that followed in the wake of those difficulties.

brother, Julio Cosentino, helped found CertiSign.[17]  Non-party, Maybach Holdings ("Maybach"), is Cosentino's British Virgin Islands entity.[18]

Non-party, CKS, is a British Virgin Islands corporation.[19]  As owner of 67.86% of CertiSign's equity, CKS is CertiSign's controlling stockholder.[20]  CKS, in turn, is owned equally by three entities: Maybach, Prime Ventures Limited ("Prime Ventures")[21] and SK Holdings (collectively, the "CKS Partners").[22]  CKS has three directors, one from each of its stockholder families.[23]  At the time of trial, those three directors were Cosentino, Kulikovsky and Isaac Khafif.[24]

---

[17] Tr. 692 (Cosentino).

[18] JX 500; Tr. 9 (Kulikovsky).

[19] PTO ¶ 8.

[20] *Id.*

[21] Prime Ventures is a holding company owned by the Safdie family, of which Edgar Safdie is a member.  *Id.*

[22] *Id.*; Tr. 389 (Khafif).

[23] JX 226 at 1; Tr. 389 (Khafif).

[24] Tr. 389 (Khafif).

Non-party, Isaac Khafif, is an officer and director of CertiSign.[25] He is also an officer of Certipar and CertiSign Brazil.[26] Khafif ultimately replaced Edgar Safdie as the Safdie family's appointee on the CKS board.[27]

Non-party, Paulo Kulikovsky, is Kulikovsky's brother.[28] He worked at CertiSign Brazil from 2002 to 2013, and was also an officer of Certipar during that time.[29] From 2005 to 2013, he was an officer of CertiSign.[30]

[Remainder of page intentionally left blank]

---

[25] Tr. 388 (Khafif).

[26] *Id.*

[27] Tr. 113 (Kulikovsky).

[28] Tr. 574 (P. Kulikovsky).

[29] *Id.*

[30] *Id.*

The following chart illustrates the current ownership structure of CertiSign and its various affiliates:[31]



[31] JX 500; PTO ¶ 9. GeoTrust was initially owned by VeriSign Capital Management ("VeriSign") until Symantec Corporation purchased GeoTrust from VeriSign in August 2010. JX 500; Tr. 9 (Kulikovsky).

## B. SK Holdings Pays CertiSign Brazil's Debt

In 2002 and 2003, CertiSign Brazil owed debts to VeriSign and Darby but was unable to pay those debts.[32] When VeriSign and Darby demanded payment, Kulikovsky caused SK Holdings to make payments on the debts directly to VeriSign and Darby on behalf of CertiSign Brazil.[33] SK Holdings ultimately paid $2,026,493.80 to VeriSign and $110,426.00 to Darby, totaling $2,136,919.80.[34] In its financial statements, CertiSign Brazil recorded a debt to "the affiliate company SK International Holdings" which "originated via payment made [on] behalf of [CertiSign Brazil] to its suppliers" (the "Debt").[35]

SK Holdings sent CertiSign Brazil seven letters reflecting the amounts paid to VeriSign and Darby on behalf of CertiSign Brazil.[36] The letters do not specify

---

[32] PTO ¶ 10.

[33] *Id.* The parties dispute whether, or in what amounts, the other CKS Partners either advanced a portion of the funds to SK Holdings from which it made the payments on behalf of CertiSign Brazil or reimbursed SK Holdings after the payments were made. *Id.* n.1.

[34] PTO ¶ 10.

[35] *Id.* To be precise, the defined term "Debt" refers to the payment obligation owed by CertiSign Brazil to SK Holdings that arose in connection with SK Holdings' satisfaction of CertiSign Brazil's payment obligations to VeriSign and Darby, respectively.

[36] PTO ¶ 11; JX 2. I note that the PTO states SK Holdings sent CertiSign Brazil six, not seven, letters reflecting the payments to VeriSign and Darby. According to JX 2, however, seven letters were sent in total: six regarding payment to VeriSign and one regarding payment to Darby.

the interest rate, maturity date or payment terms of the Debt.[37] The payments by SK Holdings, a Delaware entity, on behalf of CertiSign Brazil, represented an inflow of foreign capital into Brazil.[38] The Debt was not registered with the Brazilian Central Bank, which regulates foreign exchange and capital transactions.[39] The parties' foreign law experts agreed that Brazilian law required that CertiSign Brazil register the Debt by June 3, 2007, at the latest.[40]

## C. The 2005 Restructuring and Related Agreements

In March 2005, CertiSign entered into several agreements in an effort to reorganize (the "2005 Reorganization").[41] CertiSign's board of directors at the time, comprised of Cosentino, Kulikovsky and Edgar Safdie, approved the 2005 Reorganization by unanimous written consent dated March 16, 2015 (the "Unanimous Written Consent").[42] As part of the 2005 Reorganization, CertiSign

---

[37] JX 2.

[38] Tr. 834 (Junqueira).

[39] PTO ¶ 11. Foreign exchange and capital transactions are transactions between a Brazilian financial institution and a counterparty to purchase or sell Brazilian currency, Brazilian reais. Tr. 833 (Junqueira).

[40] Tr. 872–73 (Junqueira); 934–35 (Fernandes).

[41] JX 15; PTO ¶ 12.

[42] JX 15 at 6.

11

acquired the stock of Certipar and became the indirect parent of CertiSign Brazil.[43]

Through a Stock Contribution Agreement (the "2005 Stock Contribution Agreement"), Certipar's stockholders contributed all of their issued and outstanding shares of Certipar stock to CertiSign in exchange for shares of CertiSign stock.[44] At the time of the 2005 Reorganization, Certipar's stockholders were CKS, a Darby-affiliated investment fund and a VeriSign-affiliated investment fund.[45] The 2005 Stock Contribution Agreement also granted CKS a warrant to purchase additional shares of CertiSign capital stock.[46]

In addition to the 2005 Stock Contribution Agreement, CertiSign executed a Debt Contribution Agreement whereby CKS contributed approximately $3,800,000 of Certipar's indebtedness in exchange for 3,900,000 shares of CertiSign's Series A preferred stock.[47] The parties also amended and restated CertiSign's certificate of

---

[43] PTO ¶ 12.

[44] PTO ¶ 13.

[45] *Id.* CKS became a Certipar stockholder shortly before the 2005 Reorganization by acquiring Certipar shares that had been held by Shemtov S.A. *Id.* Prior to forming CKS, Kulikovsky and SK Holdings together held approximately 45% of Shemtov, Prime Ventures and a Safdie family member held approximately 33%, and Maybach held approximately 21%. *Id.* In connection with the 2005 Reorganization, Kulikovsky, Cosentino and the Safdie family elected to hold their shares of CertiSign stock through an entity of which each would own a third and created CKS for that purpose. *Id.*

[46] *Id.*

[47] JX 15 at 3; PTO ¶ 13.

incorporation (the "A&R COI").[48] The A&R COI created an expanded board comprising six directors, and pursuant to a voting agreement, CKS had a say in the selection of three of the six directors.[49] Specifically, the voting agreement provided that CertiSign's Class A and Class B common stockholders and Series A preferred stockholders, voting together as a single class, shall be entitled to elect three members of the board.[50] It also provided that the Class A and Class B common stockholders and Series A preferred stockholders would vote all their shares in favor of the three directors nominated by majority vote of these stockholders.[51] As owner of 67.86% of CertiSign's equity, CKS effectively controlled these three board seats.[52] Darby and Intel controlled two seats.[53] The final director would be selected by a nominating committee comprised of the other directors (excluding Intel's appointee), and this director could not be affiliated with CertiSign or any of CertiSign's stockholders, unless the nominating committee unanimously waived this

---

[48] JX 15 at 4.

[49] JX 22 at 16; JX 18 at 1–2, 13–15.

[50] JX 18 at 1–2. Class A and Class B common stockholders are CKS, Darby and VeriSign. *Id.* at 13. The voting agreement contemplates that CKS would be the sole Series A preferred stockholder. *Id.* at 14.

[51] *Id.* at 1–2.

[52] PTO ¶ 8.

[53] JX 18 at 2–3.

13

requirement.[54] The voting agreement designated Kulikovsky, Cosentino and Edgar Safdie as three of the six CertiSign directors.[55]

Also as part of the 2005 Reorganization, CertiSign entered into an agreement concerning the Debt. In or about December 2004, in anticipation of the 2005 Reorganization, $70,000 of the Debt was excused, reducing the principal amount to $2,066,919.80.[56] Then, in connection with the 2005 Reorganization, the Debt was to be divided into two parts.[57] CertiSign Brazil, CertiSign and CKS contemplated that one portion—$1,115,782.02 in principal amount—would be capitalized in a transaction involving the issuance of shares of CertiSign Series A preferred stock to CKS (the "Debt Capitalization Transaction").[58] It was intended that this portion of

---

[54] JX 18 at 1–3.

[55] *Id.* at 2. As noted, Edgar Safdie left CertiSign's board in 2006. Tr. 112–13 (Kulikovsky).

[56] PTO ¶ 11.

[57] PTO ¶ 15.

[58] The Unanimous Written Consent executed in connection with the 2005 Reorganization states: "WHEREAS, in connection with the Stock Contribution Agreement and the Debt Contribution Agreement, the Board believes it is in the best interest of the Company to enter into a Series A Stock Purchase Agreement . . . with CKS whereby the Company would issue to CKS 1,100,000 shares of its Series A Preferred Stock in exchange for $1,115,782.08." JX 15 at 3. I note that there is inconsistency regarding whether the principal amount is $1,115,782.02 or $1,115,782.08. The PTO, a draft Consent of Directors of CertiSign Holdings, Inc. and a draft stock purchase agreement all refer to the former amount, while the Unanimous Written Consent refers to the latter. *Compare* PTO ¶ 15; JX 196 at 16; JX 196 at 34, *with* JX 15 at 3.

14

the Debt would no longer accrue interest.[59] To implement the Debt Capitalization Transaction, the Company and CKS executed a Stock Purchase Agreement (the "2005 SPA") on March 29, 2005.[60] The recitals in the 2005 SPA state that CertiSign desired to raise capital to repay a "certain debt" and that CKS desired to purchase shares of CertiSign Series A preferred stock.[61] Although the 2005 SPA was executed, shares of CertiSign Series A preferred stock were never issued to CKS.[62]

The second portion of the Debt—the remaining principal balance of $951,137.78—remained due in cash, and that portion would continue to accrue interest (the "Interest Bearing Debt Portion").[63] CertiSign Brazil never made any payment of principal or interest on account of the Debt.[64]

## D. The Three Alleged Options Issuances

Following these transactions in March 2005, whereby CertiSign purportedly became the parent company of Certipar and indirect parent company of CertiSign Brazil, members of CertiSign's board of directors periodically discussed issuing

---

[59] PTO ¶ 15.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] PTO ¶ 16.

[64] *Id.*

stock options to employees and management, including during an April 2, 2008 board meeting.[65]  Kulikovsky's Amended Verified Counterclaims (the "Counterclaims") identify three alleged options issuances totaling 1,150,000 options:  (1) an April 2, 2008 issuance of 100,000 options to Kulikovsky at a $1.00 per share exercise price (the "First Alleged Issuance"); (2) an issuance between April 2008[66] and September 2010 of 100,000 options to Kulikovsky at a $1.00 per share exercise price (the "Second Alleged Issuance"); and (3) an issuance in or around September 2010 of options in the following amounts (all at an exercise price of $0.50 per share): (a) 475,000 to Cosentino; (b) 275,000 to Kulikovsky; (c) 100,000 to Julio Cosentino; and (d) 100,000 to Paulo Kulikovsky, for a total of 950,000 options (the "Third Alleged Issuance").[67]

Kulikovsky relies on the minutes of the April 2, 2008 CertiSign board meeting as evidence of the First Alleged Issuance.  Those minutes, in relevant part, state:

> Sergio *will* be elected Chairman of the Board of Directors in order to lead the process of selling the company.  Sergio *will* receive 100,000

---

[65] PTO ¶ 20.

[66] Defendants' interrogatory responses state the Second Alleged Issuance occurred "[a]t various times between August 2007 and September 2010."  JX 256 at 9.

[67] JX 258 ¶¶ 12–14.  In the PTO, the parties stipulated that in 2010, the Board discussed issuing options (to Kulikovsky, Cosentino, Julio Cosentino and Paulo Kulikovsky) in connection with a potential sale of CertiSign.  PTO ¶ 21.

stock options at the strike price of $1.00, according to the company stock options plan.[68]

Kulikovsky testified that he was never elected Chairman of the board and that no stock option instruments were ever issued for the 100,000 options.[69] As for the Second Alleged Issuance, Kulikovsky testified that it occurred "during the year 2008 somewhere," and the exercise price was "*probably* $1 per share."[70]

The details surrounding the Third Alleged Issuance are hazier still. Defendants' interrogatory responses aver that the Third Alleged Issuance granted Kulikovsky 475,000 options, not 275,000 as identified in his Counterclaims, which brings the total options allegedly granted from 1,150,000 up to 1,350,000.[71] At trial, Kulikovsky testified that the Third Alleged Issuance granted him 275,000 options.[72] Moreover, Defendants' interrogatory responses and Counterclaims state the Third Alleged Issuance occurred "in or around September 2010," but at trial Kulikovsky testified it occurred "[i]n the beginning of January 2011."[73] Kulikovsky further

---

[68] JX 49 at 2 (emphasis added).

[69] Tr. 228–29 (Kulikovsky).

[70] Tr. 206 (Kulikovsky) (emphasis added).

[71] JX 256 at 10. Notably, Kulikovsky testified that CertiSign's board is authorized to issue one million options, at most. Tr. 204–05 (Kulikovsky).

[72] Tr. 136 (Kulikovsky).

[73] JX 256 at 10; JX 258 ¶¶ 14–15; Tr. 136 (Kulikovsky).

elaborated that the options "were granted by the board, but we still had to approve them by all the board—by the whole board, because we needed to approve the expansion of the option pool. And it took until January of 2011 to get the full approval of everyone."[74]

The total number of options granted between the three alleged issuances is a mystery. An exhibit to the Counterclaims, which Kulikovsky represented is a capitalization table that was distributed to stockholders in connection with the potential acquisition of the Company in 2010, assumed management had granted 1,000,000 options.[75] This figure is lower than both the grant of 1,150,000 options described in the Counterclaims and the grant of 1,350,000 options described in Defendants' interrogatory responses. When asked about this discrepancy at trial, Kulikovsky dismissed the exhibit to the Counterclaims as having been mistakenly attached to the pleading.[76]

The exercise price of the options is also impossible to pin down in the evidence. Defendants' interrogatory responses and Counterclaims state the exercise

---

[74] Tr. 223–24 (Kulikovsky); *see also* Tr. 224 (Kulikovsky) ("Q: But you're absolutely certain that by no later than January 2011, that option—that it had been decided—that options had already been issued to those four individuals in the amounts you contend they were issued; correct? That's your testimony? A: That's my testimony.").

[75] JX 258, Ex. C.

[76] Tr. 220–23 (Kulikovsky). Kulikovsky testified that the correct exhibit should have shown 1,150,000 options. *Id.*

price was set at $0.50 per share.[77]  In the PTO, however, Kulikovsky seeks a declaration from this Court that he "holds 475,000 options to purchase shares of Class A common stock of the Company at an exercise price of *$0.10* (US) per share."[78]  At trial, Kulikovsky maintained that the strike price for the 275,000 options granted in the Third Alleged Issuance was $0.10.[79]  And, as noted, he also testified at trial that the strike price for the options granted in the Second Alleged Issuance was "probably $1 per share."[80]

Contemporaneous documents reveal that the options were neither granted nor approved by CertiSign's board and that critical terms of the alleged option grants remained in flux as late as February 2011, despite Kulikovsky having testified the Third (and final) Alleged Issuance occurred no later than January 2011.  Specifically, in a January 24, 2011 email to Company counsel regarding "document[ing] the option grants" "for an eventual sale of CertiSign," Kulikovsky wrote:

> There is still an issue as to the dates and quantities, but we'll probably issue around 1,200,000 options, which is above the current option pool of 1,000,000 options.  I'll get the ok from all parties, so will probably need some kind of board/shareholder resolution authorizing the issuance of the additional 200,000 options.  Also advise if we need the

---

[77] JX 256 at 10; JX 258 at ¶¶14–15.

[78] PTO ¶ 111 (emphasis added).

[79] Tr. 143 (Kulikovsky).

[80] Tr. 206 (Kulikovsky).

board to approve the grants individually. Options will fully vest upon sale of the company . . .[81]

At trial, Kulikovsky testified that the statements in his January 24, 2011 email were accurate, that necessary parties had not yet authorized the issuance of the options when he wrote the email and that the parties ultimately did not authorize the issuance of the options.[82]

In email correspondence on January 31, 2011, Kulikovsky and Khafif discussed the size of the option grants, again indicating that the size of the option grants had not yet been fixed, much less approved.[83] Then, on February 11, 2011, Kulikovsky again wrote to Company counsel, stating:

> We want to:
> 1. Increase option pool from 1,000,000 to 1,250,000 options of Common A . . .
> 2. Confirm the option grant (board) as follows: . . .
> b. CKS: 1,150,000 @ $0.01 per share (we will think during this weekend whether it would be better to give to CKS or to the actual individuals), grant on 29/3/05
> 3. Draft option grant agreements for the above quantities and price. Options subject to 4 yr vesting, 1 yr cliff, quarterly therefore [sic].[84]

---

[81] JX 95 at 2; JX 98 at 3; Tr. 240–41 (Kulikovsky).

[82] Tr. 240–41 (Kulikovsky).

[83] JX 92 at 5; Tr. 237–40 (Kulikovsky).

[84] JX 98 at 1.

On May 8, 2011, Kulikovsky advised CertiSign's financial consultant that "there are options still to be issued (all in accordance [with] the previously delivered data)."[85] Kulikovsky testified at trial that in October 2012, after CertiSign's counsel advised him that the document trail for the options issuances was fragmented at best, he created a capitalization table which contemplated several scenarios including "a scenario in which we do not issue the options."[86]

The record is replete with other documents discussing various options proposals with differing terms indicating that option grants had been discussed, but not actually granted.[87] I decline to rehash each document and instead have only focused on the facts relevant to my analysis.

## E. Debt Assumption

In 2010, the parties returned their focus to the Debt and how to repay it.[88] "There were many discussions from 2005 [] about how to pay. There was regulatory concern about how to pay and also there was a tax issue because taxes in Brazil

---

[85] JX 114 at 1; Tr. 144, 252–53 (Kulikovsky).

[86] JX 420 at 2, 4; Tr. 271–75 (Kulikovsky).

[87] *See*, *e.g.*, JX 96; JX 97; JX 104 at 35; JX 143 at 3.

[88] Recall that the original debt totaled $2,136,919.80. As part of the 2005 Reorganization, $70,000 of the Debt was forgiven, leaving a balance of $2,066,919.80. Of this balance, $1,115,782.02 was to be capitalized in the Debt Capitalization Transaction as contemplated in the 2005 SPA pursuant to which CertiSign would issue Series A preferred stock to CKS, leaving $951,137.78 of the Debt to be repaid. As stated, CertiSign did not issue Series A preferred stock to CKS nor did CertiSign Brazil make payment on the $951,137.78 balance.

should have been paid in relation to [the Debt]. And taxes were not paid."[89] The parties also were concerned that the Debt was not registered with the Brazilian Central Bank.[90] Thus, Khafif testified at trial that "[i]n princip[le], everybody agreed that the debt should be paid; it was just a question of how to pay it."[91]

These concerns led to suggestions in 2010 that CertiSign assume the Debt from CertiSign Brazil. There are no documents in this time frame that evidence or even suggest that CertiSign, CertiSign Brazil or SK Holdings reached any agreements in this regard.[92] But there are several contemporaneous documents that reflect the parties were taking steps to facilitate CertiSign's assumption of the Debt from CertiSign Brazil.

*First*, from December 6 through December 8, 2010, Kulikovsky, Cosentino, Khafif and others were engaged in discussions regarding calculating the exact amount of the Debt still owed to SK Holdings and the applicable interest.[93] To that end, they circulated among themselves three spreadsheet calculations representing three different interest scenarios: (1) basic interest; (2) "[c]ompound [i]nterest since

---

[89] Tr. 142 (Kulikovsky).

[90] Tr. 397 (Khafif).

[91] Tr. 398 (Khafif).

[92] PTO ¶ 19.

[93] JX 83 at 5–7.

22

the entry [sic] of Darby and Intel"; and (3) "[c]ompound [i]nterest since the start of the loan operations," which would result in Debt sizes of $2,950,608.40, $3,098,043.82, and $3,425,489.73, respectively. [94] As between these three approaches, the Interest Bearing Debt Portion had values of (1) $1,834,826.38; (2) $1,982,261.80; and (3) $2,309,707.71, respectively.[95]

Khafif favored the third approach—the computation that applied "compound interest since the start of the loan operations," resulting in $3,425,489.73 in Debt, with the Interest Bearing Debt Portion comprising $2,309,707.71 (the "Third Interest Calculation Approach"). [96] Cosentino did not object to the idea of remitting approved sums to CertiSign, and in fact, he furthered the plan by suggesting the remitted sums should not include attorneys' fees associated with drawing up contracts necessary for the assumption of the Debt at the CertiSign level.[97]

---

[94] JX 83 at 6–7. These debt size projections include both the sum that was intended for the Debt Capitalization Transaction per the 2005 SPA and the Debt balance that continued to accrue interest.

[95] *Id.*

[96] *Id.* at 5. Interestingly, although Khafif recommended the Third Interest Calculation Approach, in the same email thread, he wrote that the "CertiSign debt to SK Holdings in accordance with our suggestion should total USD 2,309,707." This calculation reflects only the Interest Bearing Debt Portion, not the $3,425,489.73 total debt value of the Third Interest Calculation Approach. *Id.*

[97] *Id.* at 6.

*Second*, certain financial documents recorded transactions related to the Debt. In December 2010, entries regarding the Debt were made in the CertiSign and CertiSign Brazil general ledgers.[98] On December 29, 2010, CertiSign recorded two debits totaling $3,434,602.00 described as "debt to be capitalized" and "investment in Certipar S.A."[99] That same day, CertiSign also recorded a $1,115,782.00 credit characterized as "debt to be capitalized"[100] and a $2,318,820.00 credit characterized as "debt with related entities – SK."[101] Also on December 29, 2010, CertiSign Brazil upstreamed a $2,350,000.00 distribution to Certipar, which then upstreamed the $2,350,000.00 distribution to CertiSign for the purpose of paying part of the Interest

---

[98] PTO ¶ 17.

[99] *Id.*

[100] As noted above, the Debt Capitalization Transaction contemplated in the 2005 SPA involved $1,115,782.02 of the Debt.

[101] PTO ¶ 17. The sum of these two credits, $2,318,820.00 and $1,115,782.00, equals CertiSign's debit that same day in the amount of $3,434,602.00. I note that the credit of $2,318,820.00 is close in value to the size of the Interest Bearing Debt Portion when interest is "compounded [] since the start of the loan operations," $2,309,707.71, as contemplated in the Third Interest Calculation Approach.

Bearing Debt Portion.[102] On December 31, 2010, CertiSign Brazil recorded a R$4,922,556.04 credit described as "forgiveness of SK Holding debt."[103]

CertiSign and CertiSign Brazil's financial statements tracked transactions related to the Debt. The upstreaming was reflected in the notes to CertiSign's consolidated financial statements for December 31, 2009, 2010 and 2011, which stated:

> The accounts payable for related company [sic] refers to the debt with SK International Holding, stemming from payments made in the name of the affiliate, CertiSign Certificadora Digital S.A., to its suppliers in previous years, with an undetermined period agreed interest rate of 9% per year, on a given amount.
>
> On December 30, 2010, the affiliate in question wrote off the debt in question to the result [sic] as a debt forgiveness operation, resulting in non-operating revenue of approximately US$ 3,035[,000]. That same fiscal year, the Company recognized this in its financial statements as an operating expense, of the amount payable stemming from the transaction in question, of US$ 3,434[,000]. On December 31, 2011, the sum outstanding relative to this operation had reached US$ 3,652[,000].[104]

---

[102] PTO ¶ 18. The money that CertiSign Brazil upstreamed to CertiSign has not been used to repay any portion of the Debt. *Id.* I note that the upstreamed $2,350,000.00 is close in value to CertiSign's recorded credit of $2,318,820.00 and the $2,309,707.71 of the Interest Bearing Debt Portion in the Third Interest Calculation Approach.

[103] PTO ¶ 17; *See* Pl.'s Opening Post-Trial Br. ("Pl.'s Opening Br.") 60 (citing JX 88 at 1).

[104] JX 417 at 46. I note the discrepancy regarding the upstreamed amount: the consolidated financial statements state $3,035,000.00 was upstreamed while the PTO states $2,350,000.00 was upstreamed. *Compare* JX 417 at 46, *with* PTO ¶ 18.

25

CertiSign's balance sheet ending December 31, 2010 reflected "total debt with SK Holding" in the amount of $2,318,820.[105]  Moreover, CertiSign's United States tax returns for 2010 and 2012 record a debt in the amount of $2,318,820 "due to SK Holdings" as one of CertiSign's "Current Liabilities."[106]  CertiSign Brazil's financial statements ending December 31, 2010 and 2011 note operating revenue that CertiSign Brazil deemed "misc. revenue – debt forgiveness," and the footnote accompanying that entry states:

> The Company opted to account for the sum of BRL 5,057[,000] on December 30, 2010, as other operating revenue – debt forgiveness referring to the existing debt up to the referred date at the affiliate company SK International Holding, originated via payment made in [sic] behalf of the Company to its suppliers.[107]

---

[105] JX 105 at 4.

[106] JX 132 at 41; JX 231 at 44.

[107] JX 167 at 48.  The footnote further qualified that, as a result of this accounting treatment, "net equity on December 31, 2011 and 2010, and the income statement for the fiscal year ending on December 31, 2010, [were] overvalued by the referred amount."  *Id.* at 30. Similarly, CertiSign Brazil's audited financial statements for fiscal year ending December 31, 2012, stated:

> At the closing of the financial statements on December 31, 2010, the Company opted to recognize, by means of forgiveness of debt, the amount owed to the company linked to SK International Holding, of approximately BRL 3.3 million, net of taxes, without the required supporting documentation.  There is no evidence that the company is relieved of this obligation, consequently, the current liabilities and the net equity may be undervalued and overvalued in the referred to sum.

JX 237 at 59.

26

Khafif's trial testimony further confirms that CertiSign and CertiSign Brazil recorded a transaction related to the Debt. He explained:

> Then [in] 2010, the company registered in its books a forgiveness of the debt and there was income generated in the company. The company paid Brazilian taxes for this forgiveness of the loan and the debt appeared in the books of CertiSign []. But that was a problem, too, because there was no proper explanation of what has been done in December 2010, what was the transaction that was done. So the auditors in Brazil, they did not approve the statements of the company and they put a qualified note in the statements stating that the debt has not been forgiven. They did not have records of the forgiveness of the debt.[108]

Khafif testified that he signed CertiSign's 2012 tax returns, with the Debt reflected, and that he did so to "the best of [his] knowledge at the time."[109]

*Finally,* there are emails and draft transactional documents in the record from 2011 and 2012 wherein Kulikovsky and Paulo Kulikovsky discussed various Debt restructuring proposals with Company counsel.[110] None of these proposals were implemented.[111]

---

[108] Tr. 399 (Khafif).

[109] Tr. 483–84 (Khafif). CertiSign points out that, notwithstanding Kulikovsky's contention that CertiSign assumed the Debt in December 2010 and corresponding financial statement entries to that effect, the record contains several proposals for Debt restructuring subsequent to December 2010. *See* Pl.'s Opening Br. 26–30 (citing JX 86 at 6–7, JX 89, JX 94, JX 109, JX 124 and JX 421).

[110] *See, e.g.*, JX 94; JX 109; JX 124; JX 421.

[111] *See* Tr. 587, 656, 664–67 (P. Kulikovsky).

Both parties' experts on Brazilian law agreed that if the Debt had been registered with the Brazilian Central Bank, the assumption of the Debt would also need to be registered.[112] Neither the Debt nor an assumption has been registered with the Brazilian Central Bank.[113]

## F. CertiSign Discovers the 2005 Reorganization-Related Defects and Commences Self-Help

In 2012, CertiSign was exploring a sale of the Company or its Brazilian subsidiaries to a third-party investor.[114] During the course of due diligence, the Company was advised of a technical flaw in the issuance of most (or possibly all) of its capital stock which, in turn, raised the possibility that some of the Company's then-current directors had not been validly elected or appointed to the board.[115] Specifically, CertiSign discovered that the outstanding stock issued in connection

---

[112] Tr. 874 (Junqueira), 935 (Fernandes). Defendants' expert, Lavinia Junqueira, maintained that even if a debt is not registered, an assumption of the debt could be undertaken. Tr. 874 (Junqueira). In her opinion, the Brazilian debtor would be subject to a fine, but failure to register does not invalidate an agreement because "the Brazilian Central Bank registration requirements do not govern the existence or not of the debt assumption." Tr. 874, 882 (Junqueira). Plaintiff's expert, Edison Fernandes, disagrees. He opined that the consequences for failure to register a debt include both a fine and a prohibition on the "transfer of money or, in other words, to make [] payment." Tr. 936 (Fernandes); *see also* Tr. 947 (Fernandes) ("Q: It is your opinion that CertiSign Brazil could not or cannot legally repay this debt unless it was registered with the Brazilian Central Bank; is that correct? A: Yes, it's my opinion.").

[113] Tr. 874 (Junqueira).

[114] PTO ¶ 22.

[115] *Id.*

28

with the 2005 Reorganization had been issued several days before the A&R COI authorizing those shares was filed.[116] CertiSign, its stockholders, and its board of directors, including Kulikovsky, concurred that the technical flaw was the result of a ministerial error and that it was appropriate to cure this defect.[117] In November 2012, the Company's counsel, Chadbourne & Parke LLP ("Chadbourne"), proposed a series of steps to remedy the Company's capitalization defect without judicial intervention (the "Self-Help").[118]

The Self-Help contemplated that the Company's directors and stockholders would take actions to correct the potential defect with respect to the outstanding shares of stock by, among other things, implementing an exchange agreement whereby stockholders would exchange all of their defective shares for valid shares.[119] The Self-Help also included documentation to authorize an Amended and Restated Stock Purchase Agreement between the Company and CKS, which amends and restates the 2005 SPA (the "A&R SPA").[120] Whereas CertiSign and CKS were

---

[116] *In re CertiSign Hldg., Inc.*, 2015 WL 5136226, at *2.

[117] PTO ¶ 22; JX 252 ¶ 1.

[118] PTO ¶ 23; JX 196.

[119] PTO ¶ 23; JX 196 at 5–6, 10–15.

[120] PTO ¶ 23; JX 196 at 5–6, 16–17, 34–46.

the only signatories to the 2005 SPA, these two entities, as well as SK Holdings, were to be parties to the A&R SPA.[121] The recitals of the A&R SPA state:

> WHEREAS, [CertiSign] desires to satisfy the principal outstanding of certain debt (the "Debt") in the aggregate amount of US$1,115,782.02 that was originally owed by [CertiSign Brazil], to [SK Holdings], which is a shareholder of CKS, but which Debt has been assumed by [CertiSign]; . . .

> WHEREAS, CKS still desires to obtain from [CertiSign], and [CertiSign] still desires to issue to CKS, 1,115,782 of the shares . . . of Series A Preferred Stock of [CertiSign] in consideration for CKS causing the Debt to be discharged; . . .[122]

The Self-Help steps also included resolutions of the CertiSign board of directors regarding the issuance of options to Kulikovsky, Paulo Kulikovsky, Cosentino and Julio Cosentino "to compensate [them] for their services to the Company's subsidiaries" and the "[r]atification of [p]rior [a]ctions [r]elating to Debt."[123] The resolutions stated that Cosentino and Kulikovsky would each receive 475,000 options at an exercise price of $0.10 per share, while Julio Cosentino and Paulo Kulikovsky would each receive 100,000 options at the same exercise price.[124]

---

[121] PTO ¶ 15; JX 196 at 6.

[122] JX 196 at 34.

[123] *Id.* at 47–48.

[124] *Id.* The execution version of the Self-Help resolutions respecting option grants does not acknowledge any previous grant(s) of options; rather, it states that "the Company *hereby grants* options" to the Kulikovsky and Cosentino brothers in the specified amounts. *Id.* at 47 (emphasis added).

As to the Debt, the resolutions contemplated "Ratification of Prior Actions Relating to Debt," and addressed the Interest Bearing Debt Portion, $1,191,402.07, which had not been wrapped up in the 2005 SPA.[125] The option grants and Debt assumption, however, were not initially included in the Self-Help documents.

As best as I can discern, on August 9, 2012, Company counsel circulated draft Self-Help documents that did not include the option grants or Debt assumption.[126] Counsel noted that the grant of options and "conversion of the debt"[127] could be "worked" into the draft documents or, alternatively, the parties could "get everything corrected and then deal with the debt and options separately."[128] Moreover, when asked about "the other note" (apparently referring to the Interest Bearing Debt Portion), Paulo Kulikovsky responded that "[t]he other note is to be paid back in

---

[125] PTO ¶ 23; JX 196 at 5–6, 47–57. Here, I pause to note a discrepancy as to the Interest Bearing Debt Portion. The Debt totaled $2,136,919.80. PTO ¶ 10. In connection with the 2005 Reorganization, $70,000 was forgiven, leaving a balance of $2,066,919.80. *Id.* at ¶ 11. Also in connection with the 2005 Reorganization, $1,115,782.02 was capitalized in the 2005 SPA and became non-interest bearing. PTO ¶ 15; JX 15 at 3; JX 196 at 34. The remaining balance of the Debt on which interest accrues, therefore, would be $951,137.78, not the $1,191,402.07 identified in the Self-Help documents. JX 196 at 48. Without more details as to whether the $1,191,402.07 figure accounts for interest accrued on the principal amount of $951,137.78, I cannot make sense of this discrepancy.

[126] JX 176 at 5.

[127] "Conversion of the debt" appears to concern converting the $1,115,782.08 portion of the Debt to CertiSign Class A preferred shares. *Id.* at 2. Thus, at this stage, the relevant actors did not even contemplate including assumption of the Debt in the existing drafts of the Self-Help documents.

[128] *Id.* at 5.

31

cash (it should remain outstanding until there is enough cash at the holding [sic] to pay it back)."[129] On August 16, 2012, Company counsel again circulated drafts of the Self-Help documents and, again, the documents did not cover option grants or assumption of the Debt.[130] Then, on August 30, 2012, Paulo Kulikovsky wrote to Company counsel and others, that:

> I took a look at the documentation, and I missed two issues that still have to be handled:
>
> - The transfer of the debt (that, for now, is to remain outstanding); and
> - Distribution of options (including an increase in the pre-approved option pool)
>
> I thought these issues would be included in this set of documents. If not, what is the strategy to be followed for this?[131]

Thereafter, at Paulo Kulikovsky's urging, language respecting the option grants and Debt assumption found its way into the Self-Help documents.[132]

When the Debt assumption was incorporated in the Self-Help efforts, the initial understanding was that the Debt *would be* assumed, not that it *had bee*n

---

[129] *Id.* at 2.

[130] JX 177 at 3.

[131] *Id.* at 1.

[132] JX 178; JX 196 at 5–6, 47–48.

assumed.[133]  For reasons unspecified in the record, on September 18, 2012, in email correspondence discussing the Self-Help documents, Company counsel represented to Paulo Kulikovsky and others that they would begin to "prepare the resolutions to reflect the assumption of the debt by Certisign Delaware."[134]  On September 19, 2012, Company counsel circulated draft resolutions, and Paulo Kulikovsky responded that same day, stating:

> My comment here is that I would like to add, on the resolution of the debt assumption, the amount of debt (in US$) that was assumed by the Holding company in 2010 []more precisely, the assumption was dated December 15, 2010 and the amount outstanding at that time (principal +[] interest) [was] US$2,309,707.71.[135]  Additionally, the debt was incurred on or prior to December 31, 2002 ([there] were a series of payments in the second half of 2002), the reason that I think it would be helpful to put such amount as of 12/15/2010.[136]

Company counsel incorporated Paulo Kulikovsky's revisions.[137]  Therefore, per Paulo Kulikovsky's request that the Self-Help documents state that the Debt had been assumed, the execution version of the Self-Help documents characterized the

---

[133] JX 178 at 1 ("With respect [t]o other remaining debt, this will [b]e simpler as it is not being converted to equity at this point but rather will be assumed by CertiSign Holding Inc.").

[134] JX 179 at 1.

[135] Note that $2,309,707.71 is the Interest Bearing Debt Portion of the Third Interest Calculation Approach discussed in December 2010.  JX 83 at 6–7.

[136] JX 180 at 1.

[137] *Id.*; JX 187 at 3; JX 196.

Debt assumption as a "Ratification of Prior Actions Relating to Debt."[138]

Specifically, the execution version of the Self-Help resolution concerning the Debt

stated,

> WHEREAS, that [sic] the Company's subsidiary, CertiSign Certificadora Digital S.A. ("CertiSign Brazil"), incurred debt on or prior to December 31, 2002 in the aggregate principal amount of $1,191,402.07, which bears interest at 9% (the "Debt");
>
> WHEREAS, the Debt is now held by SK International Holdings, LLC; and . . .
>
> RESOLVED, that the previous assumption of the Debt by the Company from CertiSign Brazil be, and it is hereby approved, ratified and confirmed in all respects.[139]

Thus, the execution version of the Self-Help documents provided for the grant of

475,000 options to Kulikovsky and designated for ratification that CertiSign had

assumed the Interest Bearing Debt Portion.[140]

---

[138] PTO ¶ 23; JX 196 at 5–6, 47–57.

[139] JX 196 at 48.

[140] JX 187; JX 196 at 47–48. While the execution version of the Self-Help documents refers to "ratification" of CertiSign's "previous assumption of the Debt" from CertiSign Brazil, as stated, when Company counsel circulated draft Self-Help documents in September 2012, Paulo Kulikovsky urged counsel to add the purported Debt assumption. *See* JX 180 at 1. As discussed below, the record does not establish that any of the affected parties in fact reached an agreement in December 2010 (or otherwise) under which CertiSign would assume the Debt.

Counsel advised the parties that they needed to execute the Self-Help documents in a specific order to ensure their validity.[141] As contemplated, the first step would be the execution of a written consent of the CertiSign board to confirm the proper election of the board members.[142] This consent was to be signed by two of the initial three directors of the Company, Kulikovsky and Cosentino.[143] As discussed below, Kulikovsky refused to sign this first written consent (or any other consents), thus bringing the entire Self-Help process to a screeching halt before it even left the gate.[144] Kulikovsky stood alone in his recalcitrance; all of the other directors and stockholders who were to participate in the Self-Help had executed their respective consents and delivered them to CertiSign, or had placed executed consents in escrow pending Kulikovsky's execution of the Self-Help documents.[145]

---

[141] JX 196 at 3 ("For example, the document will be electing a new board of directors and that Board will be approving certain documents to be signed by the Company, thus it is necessary that the new Board be elected before the other documents are signed.").

[142] PTO ¶ 24; JX 196 at 5, 7–8.

[143] PTO ¶ 24; JX 196 at 5. Edgar Safdie, the third initial CertiSign director, had previously resigned. PTO ¶ 24 n.2.

[144] PTO ¶ 25.

[145] *Id.*

35

## G. Kulikovsky Imposes Conditions on His Participation in the Self-Help

On December 12, 2012, Khafif circulated the Self-Help documents for signatures.[146] By January 9, 2013, only Kulikovsky and Darby had not executed the step-one and step-two documents which would duly elect the board and officers and then authorize a certificate of correction for CertiSign's certificate of incorporation, the exchange agreement to correct defective stock and the new warrant and stock purchase agreement.[147] Darby executed the necessary documents on February 6, 2013.[148] On February 27, 2013, Khafif emailed Kulikovsky to "insist[] [that he] sign the documents," and to "invit[e] him to come to [Khafif's] office to sign them on the same copy that [Cosentino and Khafif] signed."[149] Kulikovsky did not respond.[150] Undeterred, on March 5, 2013, Khafif emailed Kulikovsky again to reiterate that Kulikovsky needed to sign the documents, to remind him "that [] only his signature [is] missing" and to "invite him to come again . . . to [Khafif's] office to sign."[151]

---

[146] JX 203 at 1–2.

[147] *Id.* at 1.

[148] *Id.*

[149] JX 206 at 1; Tr. 417–18 (Khafif).

[150] Tr. 417–18 (Khafif).

[151] JX 206 at 1; Tr. 418–19 (Khafif).

Kulikovsky did not respond to this email either.[152] By March 13, 2013, Kulikovsky still had not signed the documents and would "not confirm if he [was] willing to sign them or not."[153]

On March 18, 2013, during a CertiSign stockholders meeting, Kulikovsky was asked again (this time in person) to sign the Self-Help documents. Kulikovsky testified that he responded to these requests by advising his fellow stockholders:

> "We need to fix CKS," because my issue was—2010-2011, we almost sold CertiSign. 2012, we almost sold CertiSign. 2013, we had no perspective [sic] of selling the company. So I was, like, "Okay, now I'm locked here in this company for another few years," as I am now. So I told them, "We need to address CKS. We need to fix CKS. We need to address [Cosentino's] debt to me. I'm very uncomfortable being the guy that's financing the person that's personally attacking me. I'm very uncomfortable being the minority shareholder for a group that all they think about is how to gain power in CertiSign, the group that thinks that I'm always to be mistrusted, that is really making a mess in the company."[154]

With these concerns in mind, Kulikovsky conditioned his cooperation with respect to the Self-Help on CKS liquidating or otherwise distributing its stock holdings in CertiSign to the three stockholders of CKS directly, so that Kulikovsky could

---

[152] Tr. 419 (Khafif).

[153] JX 207 at 1; Tr. 417–21 (Khafif).

[154] Tr. 164–65 (Kulikovsky). The debt to which Kulikovsky referred was not the Debt, but rather was a debt owed by Cosentino to Kulikovsky directly dating back to when Kulikovsky loaned money to Cosentino in connection with restructuring Shemtov into CKS. Tr. 45, 49–51 (Kulikovsky).

directly own and vote his CertiSign shares.[155]  At trial, Kulikovsky admitted that by refusing to sign the Self-Help documents, he sought to advance his bid to guarantee a CertiSign board seat by obtaining direct ownership of his portion of CKS' CertiSign stock holdings.[156]

CKS convened a stockholders meeting on May 21, 2013, to follow up on the previous CertiSign stockholders meeting where Kulikovsky refused to sign the Self-Help documents.[157]  Kulikovsky arrived at the meeting with Edgar Safdie and requested a private audience with Cosentino.[158]  According to Cosentino, Kulikovsky and Edgar Safdie tried to convince him to dissolve CKS following a buy-out (the proposal would allow any CKS stockholder to buy out the others).[159] Cosentino rejected the proposal.[160]  In the midst of this exchange, a physical

---

[155] Tr. 322 (Kulikovsky).

[156] Tr. 376 (Kulikovsky) ("what I really wanted was to make sure that my seat on the board was my seat and not the seat of CKS").

[157] JX 226.

[158] *Id.* at 2–3.

[159] Tr. 719–20 (Cosentino).

[160] *Id.*

confrontation erupted between Edgar Safdie, Khafif and Cosentino.[161] When the dust settled, Kulikovsky again refused to sign the Self-Help documents.[162]

## H. CKS Removes Kulikovsky as a CertiSign Director and Officer

Two weeks later, on June 3, 2013, Cosentino and Khafif, acting on behalf of CKS as CertiSign's majority stockholder, executed a written consent removing Kulikovsky as a director of CertiSign.[163] On June 4, 2013, the reconstituted board of directors of CertiSign resolved to remove Kulikovsky from any officer position he might have held at the Company (including president).[164]

## I. Kulikovsky's June 2014 Surrender

In June 2014, before commencing litigation, CertiSign asked Kulikovsky to sign an acknowledgment that he did not object to judicial validation of CertiSign's defective stock.[165] By letter dated June 6, 2014, Kulikovsky communicated his willingness to consent to the entry of a court order validating CertiSign's issuance of Series A and Series B common stock and Series A and B preferred stock, provided

---

[161] JX 266 at 2 (referring to "the aggression during the board meeting of CKS" and describing "punches" and "blows"); Tr. 432–34 (Khafif).

[162] Tr. 718 (Cosentino).

[163] PTO ¶ 26; JX 228.

[164] PTO ¶ 26; JX 229.

[165] *See* JX 233.

the court order resolved all issues relating to CertiSign's capital structure. [166] Specifically, Kulikovsky requested that the court order resolve "the issues relating to all Common and Preferred Stock, all options and warrants and all significant debt." [167] Of course, the Self-Help documents that Kulikovsky had previously refused to sign already addressed all of these issues. [168] Thus, in his June 6, 2014 letter, Kulikovsky finally agreed to the Self-Help without the self-interested conditions he had previously imposed. [169] CertiSign, however, did not accept Kulikovsky's surrender. Instead, CertiSign chose to litigate the Self-Help issues in this Court.

## J. Procedural Posture

In August 2014, CertiSign and Cosentino (the "Petitioners") filed an action under 8 *Del. C.* § 205, seeking the Court's validation of CertiSign's capital structure (the "Section 205 Action"). [170] Kulikovsky intervened and filed a counter-petition seeking validation of (i) CertiSign's issuance of options to purchase 1,150,000

---

[166] JX 233.

[167] *Id.*

[168] *See* JX 196 at 5–6, 16–17, 47–49.

[169] By this time, however, CKS, acting as majority stockholder of CertiSign, had already removed Kulikovsky as a CertiSign director. Therefore, Kulikovsky's belated agreement to the Self-Help was too little too late as he was no longer in a position to execute the Self-Help documents.

[170] PTO ¶ 27.

shares of CertiSign Class A common stock and (ii) CertiSign's assumption of a debt comprising $4,337,693.58 in principal and interest (as of August 1, 2014) owed to SK Holdings (i.e., the Debt).[171] Petitioners filed a motion for partial judgment on the pleadings with respect to validating CertiSign's capital structure.[172] Kulikovsky responded to that motion on April 3, 2015.[173] In his response, Kulikovsky did not object to validating CertiSign's defective capital stock, but asked that the remedy be delayed until the Court could act on all of the issues relating to CertiSign's capital structure.[174] The Court granted Petitioners' motion for partial judgment on the pleadings and thereafter entered an order validating the Company's outstanding stock and approving a proffered stock ledger.[175]

In February 2016, CertiSign initiated this action in which it alleges that Kulikovsky breached his fiduciary duty of loyalty to the Company by refusing to sign the Self-Help documents.[176] CertiSign seeks an award of damages against Kulikovsky as the remedy for the breach.

---

[171] PTO ¶ 27; JX 240 at 40.

[172] PTO ¶ 27.

[173] *Id.*; Section 205 Action, Dkt. 22.

[174] PTO ¶ 27.

[175] *In re CertiSign Hldg., Inc.*, 2015 WL 5136226, at *7; *In re CertiSign Hldg., Inc.*, 2015 WL 5786138, at *1; JX 248.

[176] PTO ¶ 28.

The parties agreed and stipulated that the same counterclaims Kulikovsky filed in the Section 205 Action could be asserted and adjudicated in this action, and that the Section 205 Action would remain pending (but would be stayed) to permit timely appeals after the conclusion of this action. [177]   Kulikovsky's two counterclaims are: Count I, asserting breach of contract related to the Debt; and Count II, seeking judicial validation that CertiSign granted certain board members and managers 1,150,000 options to purchase shares of Class A common stock of the Company and that CertiSign assumed the Debt.[178]

The parties tried the following issues:  (1) whether Kulikovsky breached his fiduciary duty of loyalty as a CertiSign director by refusing to sign the Self-Help documents[179]; (2) whether CertiSign granted 1,150,000 options to purchase shares of Class A common stock of the Company at an exercise price of $0.10 per share and whether Kulikovsky holds 475,000 such options[180]; (3) whether CertiSign assumed the Debt in the principal amount of $2,066,919.80, plus nine percent interest compounded monthly since the time SK Holdings made payment to VeriSign and Darby on behalf of CertiSign Brazil, which payment is due

[177] *Id.*; JX 258.

[178] JX 258 at ¶¶ 41–56.

[179] PTO ¶ 31.

[180] PTO ¶¶ 110–11.

42

immediately[181]; and (4) whether CertiSign should be awarded damages for Kulikovsky's breach of the fiduciary duty of loyalty.[182]

A four-day trial was held in October 2017. The parties presented post-trial oral argument on March 12, 2018. To follow is my post-trial decision.

## II.  ANALYSIS

I take up the issues in the following order:  (1) did Kulikovsky breach the fiduciary duty of loyalty; (2) did CertiSign grant options; (3) did CertiSign assume the Debt; and (4) is CertiSign entitled to damages?

### A. Kulikovsky Breached His Fiduciary Duty of Loyalty

"A public policy, existing through the years . . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation."[183]  Kulikovsky breached his duty of loyalty to CertiSign by refusing to

---

[181] PTO ¶¶ 112–14.

[182] PTO ¶¶ 107, 116.

[183] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). *See also id.* ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."); *In re Walt Disney Co.*, 2004 WL 2050138, at *5 n.49 (Del. Ch. Sept. 10, 2004) ("[T]he duty of loyalty . . . imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [a director] absolutely refrain from any conduct that would harm the corporation. This duty has been consistently defined as *broad and encompassing*, demanding of a director *the most scrupulous observance.* To that end,

sign the director consents unless and until CKS agreed to give him (through dissolution or otherwise) SK Holdings' one-third share of CKS' CertiSign share holdings and Cosentino agreed to repay to Kulikovsky a personal debt.[184]

The Court need not draw a circumstantial line between Kulikovsky's refusal to repair CertiSign's defective capital structure and a purely self-interested motive. Kulikovsky admitted that his obstruction was motivated by a desire to secure for himself a permanent CertiSign board seat. It is indisputable that Kulikovsky was the sole impediment to CertiSign's efforts to correct the potentially devastating effects of its invalid issuance of millions of shares of stock for which CertiSign's stockholders paid valuable consideration. Moreover, Kulikovsky was well aware that his refusal to sign the Self-Help documents perpetuated the defective constitution of the CertiSign board which, in turn, rendered every single board act over a period of several years invalid. By his defiance, Kulikovsky single-handedly and knowingly jeopardized CertiSign's existence and operations in order to obtain

---

a director may not allow his self-interest to jeopardize his *unyielding obligations* to the corporation and its shareholders.") (emphasis in original).

[184] *See eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 46 (Del. Ch. 2010) (finding directors "breached their fiduciary duty of loyalty by using their power as directors and controlling stockholders to implement an interested transaction" that did not "bear[] some reasonably necessary relation to the corporation's best interest" but rather was undertaken "to protect [the directors'] personal, sentimental interests . . . .").

leverage to advance his personal interests. This is the quintessential breach of the duty of loyalty. Kulikovsky's arguments to the contrary are meritless.

First, Kulikovsky argues that he resisted signing the Self-Help documents because "Delaware directors have an affirmative duty to oppose threats to the corporation and its [stockholders] from perceived harm whether a threat originates from third parties or other shareholders."[185] In the case of CertiSign, Defendants argue the threat was the "exploitation of CKS by Cosentino and Khafif to deprive the majority shareholders of the meaningful exercise of the corporate franchise."[186] Their logic courses through a tree of sagging branches: (1) CKS controls CertiSign; (2) while Cosentino and Khafif control only two-thirds of CKS, they used this control of CertiSign's majority stockholder to "drag along" the other CertiSign stockholders[187]; (3) this dynamic was contrary to the intent of CKS' founders; and yet (4) "Cosentino and Khafif refused to address their control of CertiSign on the many occasions Kulikovsky sought to discuss it"[188]; and so (5) Kulikovsky had no

---

[185] Opening Post-Trial Br. of Def./Counterclaim Pls. Sergio Kulikovsky & SK Int'l Hldgs., LLC ("Defs.' Opening Br.") 49 (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 952 (Del. 1985)) (internal quotations omitted).

[186] *Id.* at 51.

[187] *Id.* at 51–52. As stated, CKS has three board members, each representing one of the three families that own a one-third interest in CKS.

[188] *Id.* at 52.

choice but to force Cosentino and Khafif's hand regarding CKS' control of CertiSign by refusing to sign the Self-Help documents.[189]

Defendants' logic tree withers under even casual scrutiny. Even following Defendants' own logic, Kulikovsky exploited his *CertiSign* directorship to further his personal interests respecting *CKS*. A control dispute among CKS' owners, however, cannot justify Kulikovsky's decision, as a CertiSign fiduciary, to hold hostage the entire capital and board structure of CertiSign at the expense of that company's stockholders.[190] Because Defendants' position on this point utterly fails on the facts, I need not, and decline to, undertake a full-blown *Unocal* analysis as Defendants would have me do.[191]

Second, in a superficial variation of his first argument, Kulikovsky contends that he did not breach his fiduciary duty of loyalty because to have breached his duty, his actions must have been for his own benefit "at the expense of stockholders

---

[189] *Id.* ("Having been effectively disenfranchised by Khafif and Cosentino, Kulikovsky used the only measure of leverage available to him—his signature on documents needed to fix the capitalization defect—to attempt to foster a discussion with Khafif and Cosentino.").

[190] It is worth noting that Kulikovsky was quite content with CKS' capital structure, which he helped to design, when his interests aligned with Cosentino and Khafif's predecessor on CKS' board of directors, Edgar Safdie. JX 10 at 4–5, 9; JX 226 at 2; Tr. 110–14, 188–190 (Kulikovsky). That these friends fell out and took sides does not justify Kulikovsky's turning CertiSign upside down until he got his way.

[191] *Unocal*, 493 A.2d 946.

46

generally."[192] Kulikovsky reasons that if he had received his share of CertiSign stock from CKS, and had thereby regained the power to vote his shares, then other stockholders would have been released from the shackles that prevented their meaningful exercise of the corporate franchise because the reign of Cosentino and Khafif's control over CertiSign through CKS would have ended.[193] Moreover, according to Kulikovsky, "any personal benefit to Kulikovsky from a restoration of corporate democracy would be *de minimis*" because, with CKS dismantled, he would only own 23% of CertiSign and thus would not have control of CertiSign.[194]

Here again, Kulikovsky's professed altruism is not credible. As stated, Kulikovsky's conditions for executing the Self-Help documents furthered his personal interest (obtaining CertiSign stock directly, receiving repayment of a personal loan and securing for himself a CertiSign board seat) at the expense of fixing CertiSign's illegitimate board and defective capital structure. Every stockholder holding defective stock had an interest in remedying the situation immediately. Kulikovsky single-handedly derailed the Self-Help in pursuit of his personal interests. No amount of spin control can alter that reality.

---

[192] Defs.' Opening Br. at 53 (citing *OptimisCorp v. Waite*, 2015 WL 5147038, at *59 (Del. Ch. Aug. 26, 2015)).

[193] *Id.* at 54.

[194] *Id.*

Third, Defendants argue that in June 2014, Kulikovsky consented to the Self-Help documents that he had previously refused to sign, thus curing any supposed breach of his duty of loyalty.[195]  Setting aside that his past breaches of fiduciary duty were not excused when Kulikovsky finally decided to come to his fiduciary senses, Kulikovsky's pre-litigation change of heart was too little too late because, by then, he had already been removed from the CertiSign board and was, therefore, no longer authorized to execute the Self-Help documents.

Fourth, Kulikovsky argues that he "did not refuse to sign the Self-Help documents, [but rather] only declin[ed] to do so at that moment" in order "merely to prompt a discussion about CKS, which Khafif and Cosentino were unwilling to abide."[196]  Perhaps a "momentary" refusal to act might be excusable.  Perhaps.  But Kulikovsky was first asked to sign the Self-Help documents in December 2012.[197]  He refused and maintained that position until June 2014, when he finally made the futile offer to consent to the Self-Help.  By then, CertiSign was poised to seek relief from the Court under Section 205.

---

[195] Post-trial Answering Br. of Def./Counterclaim Pls. Sergio Kulikovsky & SK Int'l Hldgs., LLC ("Defs.' Answering Br.") 18.

[196] *Id.* at 17.

[197] JX 203 at 1–2.

The evidence reveals that Kulikovsky was displeased that his former friends had joined forces against him. He was displeased that they were critical of his leadership of CertiSign. And he was displeased that they had, effectively, removed him from that position and then boxed him into his minority position. His frustration and anger is a product of basic human nature. It is not, however, a justification for petty tactics that jeopardized the well-being of CertiSign and its stockholders for the sake of personal advantage and satisfaction. That conduct was a breach of the duty of loyalty.

## B. The Option Grants

Defendants seek a declaration that Kulikovsky currently holds 475,000 options to purchase shares of Class A common stock of CertiSign at an exercise price of $0.10 per share.[198] According to Defendants, CertiSign clearly intended to grant these options.[199] Thus, Defendants argue, if the grants were for some reason defective, then this Court should validate the grants under Section 205.[200]

CertiSign acknowledges its principals frequently discussed the grant of stock options and may have even agreed in broad terms that granting stock options was a good idea. But CertiSign is adamant that the parties never reached agreement on the

---

[198] PTO ¶ 111; Defs.' Opening Br. 17, 44.

[199] Defs.' Opening Br. 46–47.

[200] *Id.* at 47–48.

49

essential terms of a stock option plan. There is, therefore, no corporate act for the Court to validate under Section 205. Here again, the preponderance of the evidence supports CertiSign's position.

Under 8 *Del C*. § 157(a), "[s]ubject to any provisions in the certificate of incorporation, every corporation may create and issue . . . rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors." While this statutory grant of authority to create an option plan is quite broad, as reflected in the enabling provisions of Section 157(a), the plan must be formally adopted by the corporation and its terms must be set forth specifically in an "instrument," as required by 8 *Del. C*. § 157(b):

> The terms upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the consideration (including a formula by which such consideration may be determined) for which any such shares may be acquired from the corporation upon the exercise of any such right or option, shall be such as shall be stated in the certificate of incorporation, or in a resolution adopted by the board of directors providing for the creation and issue of such rights or options, and, in every case, shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options. A formula by which such consideration may be determined may include or be made dependent upon facts ascertainable outside the formula, provided the manner in which such facts shall operate upon the formula is clearly and expressly set forth in the formula or in the resolution approving the formula. . . .

The basic requirements prescribed by Sections 157(a) and (b) are not onerous. To evidence an intent to create and issue stock options, the corporation must manifest that intent with requisite specificity either in its "certificate of incorporation, or in a resolution adopted by the board of directors."[201] Defendants have proffered neither in the trial record. For this reason alone, Kulikovsky's claim that he holds CertiSign stock options must be rejected.

Even if the Court were to look past the absence of any formal recognition of the stock options, the evidence still falls short of revealing that the CertiSign board reached a meeting of the minds on key terms of any option grants such that a Section 205 validation could even be attempted. To be sure, the necessary parties discussed stock options frequently, and all involved in those discussions appeared to agree that option grants were appropriate. But the discussions were fluid and even Kulikovsky remained unclear as to key aspects of the option grants both before and after this litigation was initiated. Simply stated, the evidence falls short of the mark required to justify specific performance or validation of an intended, but defective, corporate act.

---

[201] 8 *Del. C.* § 157(b).

## 1. The Alleged Option Grants Were Not Approved in the Certificate of Incorporation or by Board Resolution

According to Defendants, CertiSign's intent to execute the First Alleged Issuance is evidenced not in the CertiSign certificate of incorporation or in any formal board resolution (as required by Section 157(b)), but rather in the minutes of the CertiSign board's April 2, 2018 meeting.[202] As for the Second Alleged Issuance and the Third Alleged Issuance, Defendants rely on emails and correspondence as evidence of the board's intent to create and issue the options.[203] And, as for the actual execution of the stock option grants, Defendants acknowledge that there is no "instrument" that reflects the specific "rights" attached to the grants or the "formula" by which the specific grants were "determined."[204] The total failure to comply with

---

[202] Tr. 134, 211–212 (Kulikovsky); Defs.' Opening Br. 17 ("CertiSign's April 2, 2008 minutes confirm the Board awarded Kulikovsky '100,000 stock options at the strike price of $1.00, according to the company stock options plan.'") (quoting JX 49 (minutes of April 2, 2008 CertiSign board meeting)).

[203] Defs.' Opening Br. 18, 46 (citing JX 81, JX 92, JX 96, JX 115, JX 135, JX 143, JX 414).

[204] Tr. 212:19–23 (Kulikovsky) ("Q: CertiSign Holding never issued any option certificates or option instruments representing the options that you claim along the lines of a stock certificate, did they? A: That's correct."). *See also Niehenke v. Right O Way Transp., Inc.*, 1995 WL 767348, at *3 (Del. Ch. Dec. 28, 1995) ("In purporting to issue an option to his wife, Hayes failed to adhere to provisions in section 157 which require that the terms of the options be separately stated in either the certificate of incorporation or in a resolution adopted by the board of directors. There is no persuasive evidence of such board resolution. Consistent with the interest in protecting against fraudulent, secretive or otherwise improper issuance of stock option rights and with other evidence questioning the timing and valid issuance of the Hayes Option, the failure here to adhere to statutory formality renders the Hayes Option void and unenforceable.") (internal citations omitted).

any aspect of Sections 157(a) and (b) is alone a basis to reject Defendants' claim for stock options and is, at the least, powerful evidence that the CertiSign board did not intend to authorize the options.

Defendants urge the Court to proceed beyond the CertiSign board's failure to meet the statutory requisites of Section 157 and to employ Section 205 as a means to remedy that failure. According to Defendants, the evidence reveals that the CertiSign board did everything but comply with Section 157(b) with respect to the grant of stock options. Thus, all that is left to do is bless the option grants by court order as if the board had properly completed the process. I disagree.

## 2. The Alleged Option Grants Lacked Specificity as to Material Terms

Section 157(b) requires option grants to be specific as to material terms of the grant, including maturity, exercise price and vesting.[205] In *Grimes v. Alteon*, our Supreme Court reiterated prior rulings in which the court emphasized that Section 157 reflects a statutory mandate for "strict adherence to [] formality in matters relating to the issuance of capital stock."[206] *Grimes* emphasized, "the issuance of corporate stock is an act of fundamental legal significance having a direct

---

[205] 8 *Del. C.* § 157(b) ("The terms upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the consideration (including a formula by which such consideration may be determined) for which any such shares may be acquired from the corporation upon the exercise of any such right or option, shall be such as shall be stated . . .").

[206] 804 A.2d 256, 260 (Del. 2002).

bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters."[207]

The evidence presented by Defendants in support of their options counterclaim was striking in its lack of certainty with respect to material terms of the purported option grants, and fell well short of demonstrating that the CertiSign board had authorized a grant to Kulikovsky of 475,000 options at an exercise price of $0.10.[208] Indeed, Defendants have struggled to maintain any consistent narrative with respect to even the most basic elements of the option grants, including the quantity of options that were issued, the exercise price, when the options were issued and even the recipients of the options. These basic elements must be fixed before any valid claim to the options may be pressed so that "everyone know[s] what [the] claims on the capital will be, who has rights to invest capital, and what rights the corporation has with respect to actual or potential investors."[209]

---

[207] *Id.*

[208] PTO ¶ 111.

[209] *Grimes*, 804 A.2d at 259. Other material terms include duration and vesting. 8 *Del. C.* § 157(b). *See also Sai Man Jai, Ltd. v. Personal Computer Card Corp.*, 1991 WL 110458, at \*2 (Del. Ch. June 18, 1991) (finding "whether the option was exercisable only upon payment of cash, or whether the option could be exercised in exchange for a promissory note," to be a material term).

## (a) Uncertainty as to Exercise Price and Quantity Issued

As stated, Defendants claim CertiSign issued 475,000 options to Kulikovsky via three alleged options issuances: the First Alleged Issuance of 100,000 options as authorized during an April 2, 2008 CertiSign board meeting, the Second Alleged Issuance of 100,000 options as authorized at some point between April 2008 and September 2010 and the Third Alleged Issuance of 275,000 options as authorized in or around September 2010. While the evidence relating to each of the option grants is as clear as dishwater, the evidence surrounding the Third Alleged Issuance is the most puzzling and best illustrates the fallacy of Defendants' claim. According to the verified Counterclaims, the Third Alleged Issuance granted Kulikovsky 275,000 options out of a total 950,000 options granted.[210] Defendants provided a different number in their sworn interrogatory responses where they stated that Kulikovsky had been granted 475,000 options.[211] The fact that Defendants' sworn statements of fact differ so substantially on a point where "certainty" is required is bad enough. That the revised version of history fails as a matter of mathematics makes the claim even less credible. Defendants' claim for options in the Third Alleged Issuance, whether based on 275,000 or 475,000 options, assumes that CertiSign granted either 1,150,000 or 1,350,000 total options. The math does not work given that, under

---

[210] JX 258 ¶ 14.

[211] JX 256 at 10.

either scenario, Kulikovsky would have CertiSign granting either 150,000 or 350,000 options in excess of the 1,000,000 options pool "limit" as reflected in the A&R COI.[212]

As for the exercise price, Kulikovsky testified he was uncertain about the exercise price of the Second Alleged Issuance, stating it was "probably $1 per share."[213] Kulikovsky's testimony that the exercise price was "probably $1" is, on its face, lacking in requisite "certainty."[214] Moreover, it bears no resemblance to the $0.10 per share exercise price that Defendants advanced at trial.[215] Given Kulikovsky's own lack of clarity or consistency regarding the exercise price, it is

---

[212] JX 22, art. IV § B(4)(d)(ii)(C); JX 256 at 10. The total number of options authorized in the pool was itself a moving target in the evidence. The verified Counterclaims put the total number at 1,150,000; Defendants' interrogatory responses put the number at 1,350,000; a capitalization table distributed to stockholders in connection with a possible sale of the Company (attached as Exhibit A to the Counterclaims), in my view the most credible evidence, put the number at 1,000,000; an email that Kulikovsky wrote in January 2011 put the number at 1,200,000; and an email that Kulikovsky wrote in February 2011 put the number at 1,250,000. JX 258 ¶ 14; JX 256 at 10; JX 258, Ex. C; JX 95 at 2; JX 98 at 1.

[213] Tr. 206 (Kulikovsky).

[214] *Grimes*, 804 A.2d at 260.

[215] Tr. 206 (Kulikovsky). Here again, Defendants' position on exercise price is remarkable in its utter lack of consistency. The Counterclaims said $1.00 for the First and Second Alleged Issuance and $0.50 for the Third Alleged Issuance; emails from Kulikovsky suggested an exercise price of $0.01 per share; and then Kulikovsky testified at trial that the exercise price for the Third Alleged Issuance was $0.10 per share. Tr. 143 (Kulikovsky). Kulikovsky's change in tune going into trial came as a surprise to CertiSign as well. *See* Pl.'s Opening Br. 13–14 ("For the first time, in the pre-trial order, Kulikovsky contends CertiSign issued all the alleged options at an exercise price of $0.10 per share.").

not surprising that Defendants do not even mention, much less highlight, any evidence that the CertiSign board ever set a $0.10 per share exercise price.[216]

### (b) Uncertainty as to Timing and Recipients

The timing of the option grants is also murky. Though the Third (and final) Alleged Issuance supposedly occurred in or around September 2010, on January 24, 2011, Kulikovsky wrote, "[t]here is still an issue as to the *dates* and quantities, but we'll probably issue around 1,200,000 options, which is above the current option pool of 1,000,000 options."[217] Moreover, Kulikovsky's February 11, 2011 email to Company counsel indicated that the identit(ies) of the option grantee(s) remained to be determined.[218]

Kulikovsky's emails to Company counsel in January and February 2011 perhaps best illustrate the uncertainty regarding the alleged option issuances. Those emails, together with related documents and trial testimony, make clear that the following questions remained undecided: (1) whether 1,000,000 options, 1,150,000

---

[216] Defendants' Opening Brief mentions $0.10 exactly once, in connection with discussing a May 11, 2012 email where Cosentino suggested telling Chadbourne the exercise price of options is $0.10. Defs.' Opening Br. 20 (citing JX 142) ("Let's send to [Chadbourne] the quantity of arranged options. I suggest putting US$ 0.10 as the cost."). Cosentino's suggestion is not the equivalent of a board decision setting the exercise price at $0.10. *See Grimes*, 804 A.2d at 266 (holding that "to the extent such transactions obligate the board concerning stock issuance, *the board must approve them* in writing") (emphasis added).

[217] JX 95 at 2 (emphasis added).

[218] JX 92 at 5.

options, 1,200,000 options, 1,250,000 options or 1,350,000 options had been issued;

(2) whether the exercise price was $1.00, $0.50, $0.10 or $0.01 per share;

(3) whether CKS or unidentified individuals received the option grants; and (4) as

of when the options were granted.[219]  On a claim where evidentiary precision is

necessary, Defendants' evidence is a study in obscurity.

### 3. Validation under Section 205 is Not Available

"The Court cannot determine the validity of a defective corporate act without

an underlying corporate act to analyze."[220]  As this Court has explained:

> There must be a difference between corporate acts and informal
> intentions or discussions.  Our law would fall into disarray if it
> recognized, for example, every conversational agreement of two of
> three directors as a corporate act.  Corporate acts are driven by board
> meetings, at which directors make formal decisions.  The Court looks
> to organizational documents, official minutes, duly adopted resolutions,
> and a stock ledger, for example, for evidence of corporate acts.[221]

Here, although there were extensive board discussions in principle agreeing to issue

options, no options were actually issued as evidenced by the lack of board documents

or instruments authorizing or granting such options.  Even if there existed board

---

[219] JX 49; JX 95 at 2; JX 98 at 1–2; JX 142; JX 256 at 10; JX 258 ¶¶ 12–14; JX 258, Ex. C; Tr. 143, 206 (Kulikovsky).

[220] *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *9, 11 (Del. Ch. Jan. 30, 2015) (finding no corporate act to validate where the party seeking validation had "not been able to establish when any board approved an issuance of 400,000 shares to her"), *aff'd sub nom. In re Numoda Corp.*, 128 A.3d 991 (Del. 2015).

[221] *Numoda*, 2015 WL 402265, at *9 (internal citation omitted).

documents purporting to grant options (including defective documents), the alleged option grants lack definite, material terms such as the quantity, exercise price, timing of grants and recipients. Consequently, they are not legally cognizable. A defective corporate act is a prerequisite to validation of the defective act. On this record, Defendants have not proven there was a defective corporate act (and not merely discussions among board members) for this Court to validate. For that reason, Section 205 does not work here.[222]

## C. The Debt

Defendants seek a declaration that, in or before December 2010, CertiSign assumed the Debt in the principal amount of $2,066,919.80, plus nine percent interest compounded monthly since the time that SK Holdings made payments to VeriSign and Darby on behalf of CertiSign Brazil. They also seek a declaration that the Debt is due and payable immediately to SK Holdings.[223] At a basic level, the

---

[222] Even if Defendants were to argue (which they do not) that the inclusion of the option grants (or the assumption of the Debt) in the Self-Help documents evidences a prior agreement to grant the options (or assume the Debt), Section 205 still would not work. The credible evidence reveals that the options and Debt were included in the Self-Help documents not because the CertiSign board had reached an agreement to grant options or assume Debt, but rather because Kulikovsky and his brother pushed to resolve the lingering questions regarding the options and the Debt at the same time the Board sought to ratify the 2005 stock issuances. *See* JX 176–180. That counsel acquiesced and included the extraneous matters in the Self-Help documents does not mean there was a deliberate corporate act that can now be validated.

[223] PTO ¶¶ 112–14.

parties agree a debt is owed to SK Holdings and must be repaid. [224] They disagree, however, as to who owes the Debt. CertiSign maintains the Debt is owed by CertiSign Brazil. Defendants, on the other hand, contend that CertiSign has assumed the Debt from CertiSign Brazil and should be ordered to pay it immediately.

During trial, Kulikovsky agreed on behalf of SK Holdings to accept repayment from either CertiSign or CertiSign Brazil. And both parties' Brazilian law experts agreed that there are straightforward, lawful methods by which the Debt can be repaid. Nevertheless, consistent with their demonstrated pattern of leaving all business sense at the courtroom door, the parties have declined to reach a business solution to this problem in favor of litigation.

Because the parties do not dispute that the Debt exists and should be repaid, I accept that reality as a matter of fact and turn to the questions of who owes the Debt, has it been assumed and can it be repaid in compliance with Brazilian law even though it was never registered with the Brazilian Central Bank. [225] I address each question in turn below. [226]

---

[224] Tr. 398 (Khafif) ("In princip[le], everybody agreed that the debt should be paid; it was just a question of how to pay it"); Pl.'s Opening Br. 62 ("All parties agree the Debt should be repaid.").

[225] Tr. 398 (Khafif); Pl.'s Opening Br. 62.

[226] During post-trial oral argument, I reserved decision on Defendants' motion to strike CertiSign's statute of limitations argument, raised by CertiSign for the first time in post-trial briefing in response to an incredibly confusing characterization of the Debt assumption claim advanced by Defendants during and after trial. OA Tr. 11, 15. Given my findings

## 1. Choice of Law

Before addressing the questions relating to debt assumption, I must first answer the threshold question of whether Brazilian or Delaware law governs this issue. Not surprisingly, the parties' Brazilian law experts disagreed on choice of law.[227] On behalf of Defendants, Junqueira opined that Delaware law governed the debt assumption issues under Brazilian choice of law doctrine.[228] She testified that Brazilian law dictates that a transaction, such as a debt obligation, "is governed by the law of the country where it [was] created. So it doesn't matter where the debtor is. It matters where the obligation has been created."[229] In the case of a debt obligation, Brazilian law deems "the place where the creditor is and where the creditor is disbursing the funds" as the place where debt obligation was created for

---

here, I decline to reach the statute of limitations issue and, therefore, deny the motion to strike as moot. CertiSign's request for fees in connection with Defendants' motion to strike is denied. Fee-shifting under the "bad faith" exception to the American Rule is warranted only where the party seeking fee-shifting has shown by clear evidence that "the party against whom the fee award is sought . . . acted in *subjective* bad faith." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997) (emphasis in original), *aff'd*, 720 A.2d 542 (Del. 1998). Here, CertiSign has not adduced "clear evidence" that Defendants' motion to strike is (or was) the product of Defendants' "subjective bad faith."

[227] Ct. Ch. R. 44.1 ("The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. The Court's determination shall be treated as a ruling on a question of law.").

[228] Tr. 851–57 (Junqueira).

[229] Tr. 853 (Junqueira).

61

purposes of choice of law.[230]  According to Junqueira, in this case, "the creditor disbursing the fund[s was] SK Holdings, a Delaware entity, and the funds [were] disbursed in the U.S."[231]  Thus, Brazilian law must give way to Delaware law with respect to issues relating to the Debt obligation.[232]

---

[230] Tr. 854 (Junqueira).

[231] *Id.*

[232] CertiSign brought a motion *in limine* to exclude Junqueira's rebuttal report and testimony to the extent it opined that Delaware law applies to the Debt and the subsequent assumption of the Debt by CertiSign.  According to CertiSign, Junqueira was attempting not only to supplant the Court's adjudicative role, she also sought to opine on Delaware law, a subject about which she is unqualified to testify.  Junqueira clarified at trial that her opinion was based solely on Brazilian law:

> [T]he Brazilian Civil Code does not apply to determine whether CertiSign Holding made the sufficient expression of will and to the formalities for the obligation because the law of the place where the obligation is created appl[ies]. . . . [T]he Brazilian Civil Code rules do not apply initially to [the Debt] obligation because it was not created in Brazil.  And then since this discussion is handled in the Delaware court, it is up to the Delaware court, then, to decide which law should apply to the obligation.  But my intention was to say that – to rebut [] what Mr. Edison Fernandes was stating in his report, that the Brazilian Civil Code would apply, because my understanding was that it was not applicable.  So when I say Delaware law [applies], my intention was actually to say Delaware jurisdiction.  So this Court should decide which law applies.

Tr. 884–85 (Junqueira).  Indeed, Junqueira's rebuttal report clarified that her opinion was simply that "[t]he formalities established in the Brazilian Civil Code regarding debt assumption are not applicable in this case."  JX 170 at 3.  Based on Junqueira's clarifications regarding the scope of her opinion in her rebuttal report and at trial, I am satisfied she was not purporting to address Delaware choice of law principles or to tell this Court how to apply them.  I view her opinions as addressing Brazilian law only and have considered them solely in that context.  I note that CertiSign's counsel also appeared to accept Junqueira's clarification following her trial testimony.  *See* Tr. 886 (Junqueira) (CertiSign's counsel: "Your Honor, I guess with that, I'm wondering if I need to ask further questions on this topic because we had understood . . . that her report was saying that

On behalf of CertiSign, Fernandes did not opine explicitly on choice of law. Rather, his opinions assumed that Brazilian law applies.[233] Because Fernandes did not address Brazilian choice of law doctrine, I accept Junqueira's unrebutted opinion that, at least under Brazilian choice of law doctrine, Brazilian law does not govern the Debt obligation or the purported assumption of the Debt by CertiSign.

Even if the Court were to engage more thoroughly on the choice of law question, the result would not change for the simple reason that there is no conflict between Brazilian and Delaware law with respect to the relevant Debt related issues.[234] While the pathways may vary some, the application of either Brazilian or Delaware law leads to the same final destination.

---

Delaware law applies and now I understand her to be agreeing with us that you decide the choice of law under Delaware choice-of-law principles.").

[233] Tr. 938 (Fernandes) ("Q: . . . Based on your analysis, what is your opinion of whether CertiSign Holding assumed the debt from CertiSign Brazil? A: Okay. First of all, I -- I['d] like to be clear that I assumed that I have [] analyzed this situation under Brazilian law. I'm not saying that Brazilian law [] appl[ies] or not, but I am assuming this situation under [] Brazilian law."); Tr. 959 (Fernandes) ("Q: And it is your opinion . . . that Brazilian law applies to the question of whether CertiSign Holding made a sufficient expression of will to assume the debt. A: I don't have an opinion about Delaware law or Delaware court[s]. What [I can say] is under [] Brazilian law, we have [a] debtor that is [a] Brazilian company. So we have some connection with [] Brazilian law. Q: And so it's your opinion that Brazilian law applies to this question; correct? A: No. My assumption is that Brazilian law appl[ies].").

[234] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (explaining that, in the case of a "false conflict, [] the court should avoid the choice-of-law analysis altogether").

## 2. No Assumption under Brazilian Law

If Brazilian law applies, Fernandes opined that the consent of the party assuming the debt and the creditor is required in order for an assumption of debt to take place.[235] According to Fernandes, the so-called "expression of will doctrine" governs that consent under Brazilian law.[236] Under this doctrine, an expression of will occurs "when the part[ies] show the intention or said intention" or "when the part[ies] confirm this expression of will [] in a contract or with any document or with some behavior that confirm[s] the expression of will."[237] Applying the doctrine, Fernandes concluded that CertiSign did not assume the Debt because an expression of will to assume a debt must be achieved through a resolution of a board of directors. Recognition of the Debt in CertiSign's audited financial statements, even though approved by CertiSign's board or officers, is not a sufficient expression of will because the board did not expressly resolve to assume the Debt. Moreover, because

---

[235] Tr. 958 (Fernandes).

[236] *Id.* Because she concluded that Delaware law applied, Junqueira did not opine on whether the Debt was assumed under Brazilian law. Tr. 860 (Junqueira) (The Court: "As regards to debt assumption, my understanding is under Brazilian law, she has offered no opinion beyond saying she agrees with Mr. Fernandes.").

[237] Tr. 938–39 (Fernandes). At his deposition, Fernandes testified that under Brazilian law, "[t]here is not any specific form required [for an expression of will], but there needs to be a decision of the people in charge." *See also* Tr. 861 (Junqueira).

the audited financials are subject to qualifiers from the auditors, they also cannot evidence the Board's unfiltered expression of will.[238]

Fernandes' testimony was credible. While there certainly is some circumstantial evidence in the trial record that might suggest CertiSign had "expressed its will" to assume the Debt, the absence of any board resolution, contract or even unequivocal correspondence to that effect, in my view, is telling. In the absence of such evidence, I do not find an adequate "expression of will" by the parties to consummate an assumption by CertiSign of CertiSign Brazil's debt to SK Holdings under Brazilian law.

### 3. No Assumption under Delaware Law

Under Delaware law, "[a] contract for the assumption of the liabilities of another is a third party beneficiary contract in which the debtor is the promisee, the assuming party the promisor, and the original creditor the beneficiary."[239] A "valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[240] "Whether both of the parties manifested an intent to be

---

[238] Tr. 964–972 (Fernandes).

[239] *John Julian Const. Co. v. Monarch Builders, Inc.*, 306 A.2d 29, 33 (Del. Super. Ct. 1973), *aff'd*, 324 A.2d 208 (Del. 1974).

[240] *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

bound is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[241] "To determine whether a binding contract exists, therefore, courts in Delaware look for objective, contemporaneous evidence indicat[ing] that the parties have reached an agreement, whether that be in the parties' spoken words or writings."[242] Based on the record, I find that, although CertiSign and CertiSign Brazil contemplated that CertiSign would assume the Debt in December 2010, they stopped short of entering into an enforceable contract.

### (a) Circumstantial Expressions of Intent to Assume the Debt

There is no dispute that SK Holdings clearly intended that CertiSign would assume the Debt. The dispute is whether CertiSign and CertiSign Brazil ever reached that same state of clarity. In my view, they did not.

To be sure, there is evidence indicating that a debt assumption was contemplated. For instance, CertiSign Brazil approved upstreaming $2,350,000 to CertiSign to repay a portion of the Debt and both CertiSign and CertiSign Brazil evidenced the assumption in their financial statements and general ledgers.[243] The amount of the upstreamed funds, $2,350,000, approximates the Interest Bearing

---

[241] *Id.*

[242] *Id.*

[243] PTO ¶ 18; JX 417 at 46.

Debt Portion of the Third Interest Calculation Approach ($2,309,707.71) which Kulikovsky, Cosentino, Khafif and others discussed in December 2010 as part of an effort to calculate the amount of the Debt owed to SK Holdings and the applicable interest. [244] Moreover, CertiSign Brazil's general ledgers contained entries indicating "forgiveness of SK Holding debt"[245] and it paid Brazilian taxes for the loan forgiveness. [246] Indeed, CertiSign Brazil's financial statements ending December 31, 2010 and 2011 note operating revenue that was deemed "misc. revenue – debt forgiveness."[247]

For its part, CertiSign's balance sheet ending December 31, 2010, shows an entry "total debt with SK Holding" in the amount of $2,318,820,[248] and its United States tax returns for 2010 and 2012 list debt due to SK Holdings as a current liability, also in the amount of $2,318,820.[249] In December 2010, CertiSign recorded

---

[244] JX 83 at 5–7.

[245] Pl.'s Opening Br. 60 (citing JX 88 at 1).

[246] Tr. 399 (Khafif).

[247] JX 167 at 48.

[248] JX 105 at 4.

[249] JX 132 at 41; JX 231 at 44. Khafif signed CertiSign's 2012 tax returns, which reflected the Debt, and he testified that the document reflected "the best of [his] knowledge at the time." Tr. 483–84 (Khafif). Entries on filed tax documents can be deemed admissions of contested facts. *See Numoda*, 2015 WL 402265, at *11 ("Given the lack of formality, the evidence that these contested acts occurred largely exists in the form of testimony,

two debits, totaling $3,434,602, that it described as "debt to be capitalized" and "investment in Certipar S.A.," as well as two credits, also totaling $3,434,602 (a $1,115,782 credit and a $2,318,820 credit), characterized as "debt to be capitalized" and "debt with related entities – SK."[250] The $1,115,782 credit matches the $1,115,782.02 non-interest bearing portion of the Debt that was to be capitalized pursuant to the 2005 SPA,[251] while the $2,318,820 credit is close to the amount upstreamed and the Interest Bearing Debt Portion.

### (b) Specificity of the Terms of the Assumption

Despite the evidence of an intent to assume the Debt in CertiSign and CertiSign Brazil's general ledgers, financial statements and tax returns, the terms of the assumption as reflected in those documents lack the specificity required to evidence a binding agreement that can be specifically enforced by the Court or validated under Section 205.[252] The numbers appearing on the various financial documents discussed above are close in value to the Debt, but they do not replicate

---

documents prepared by independent contractor John Dill ('Dill'), and representations by agents of the corporations (such as tax filings) not formally adopted by the board.").

[250] PTO ¶ 17.

[251] JX 196 at 48.

[252] *See Szambelak v. Tsipouras*, 2007 WL 4179315, at *4 (Del. Ch. Nov. 19, 2007) (to obtain specific performance the plaintiff must demonstrate, by clear and convincing evidence, the terms of "a valid and specifically enforceable contract").

the Debt in a manner that would support a finding that the terms of the Debt assumption are stated there. In particular, the amount upstreamed, the Interest Bearing Debt Portion and the amount CertiSign credited differ by as much as $40,292.29. Furthermore, it is unclear whether the plan was for CertiSign to assume the entire Debt or just the Interest Bearing Debt Portion. CertiSign's financial statements show credits and debits that appear to account for the non-interest bearing portion of the Debt, but CertiSign Brazil appears to have only upstreamed enough to cover the Interest Bearing Debt Portion. Therefore, the circumstantial evidence within the financial statements raises unanswered questions that preclude a finding that the parties entered into a "specifically enforceable contract."[253]

### (c) Legal Consideration

Even assuming I could find that the terms of the assumption were sufficiently definite to allow for specific enforcement, it is difficult to discern how the parties exchanged legal consideration. "It is well settled that consideration for a contract can consist of either a benefit to the promisor or a detriment to the promisee."[254]

---

[253] *Id.*

[254] *First Mortg. Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795–96 (Del. 1982). *See also* 3 Williston on Contracts § 7:19 (4th ed.) ("so long as the promisee incurs a bargained-for detriment, in exchange for the promisor's undertaking, the promisor's promise is supported by consideration and may be enforced"). I note that, in this case, the lack of specificity with regard to the terms of the purported Debt assumption makes designating who is "promisor" and who is "promisee" for purposes of determining the

Viewing this transaction most favorably to Defendants, CertiSign Brazil upstreamed cash to CertiSign so that CertiSign could pay CertiSign Brazil's debt. With that transactional structure in mind, it is difficult to see any benefit or detriment to either party. CertiSign Brazil was to pay off a debt that it already owed, albeit through CertiSign as middleman; for its part, CertiSign was to receive money from CertiSign Brazil so that it could pay off CertiSign Brazil's debt. Without a formal debt assumption in hand that might provide some nuanced twist to the consideration analysis, I cannot detect any cognizable benefit or detriment as between the parties to the purported agreement that could support a finding of legal consideration.

### (d) Statute of Frauds

Even if Defendants could clear the legal consideration hurdle, they still run smack into the impassable wall that is the statute of frauds. Under 6 *Del. C.* § 2714(a), Delaware's statute of frauds, agreements to answer for the debt of another—assumption of debt—must be reduced to a writing.[255] "The contract to

---

adequacy of legal consideration more complicated than usual. That fact, alone, suggests that consideration is lacking here.

[255] 6 *Del. C.* § 2714(a) ("No action shall be brought to charge any person upon any agreement made upon consideration of marriage, or upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or upon any agreement that is not to be performed within the space of 1 year from the making thereof, *or to charge any person to answer for the debt,* default, or miscarriage, *of another*, in any sum of the value of $25 and upwards, *unless the contract is reduced to writing*, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing . . .") (emphasis added); *Borish v. Graham*, 655 A.2d 831, 834 (Del. Super. Ct. 1994) ("Section 2714(a) of Title 6 of the

assume the debt of another must not only be in writing but the writing must contain on its face enough to show that the person signing it was assuming liability."[256] And the fact the Debt could have been repaid within one year does not remove the purported assumption agreement from the strictures of the statute of frauds.[257]

Defendants argue that the existence of multiple writings evidencing the Debt assumption satisfies the statute of frauds.[258] Indeed, our law recognizes that "[m]ultiple writings will satisfy the statute of frauds if they (a) reasonably identify the subject matter of the contract, (b) indicate that a contract has been made between the parties or an offer extended by the signing party and (c) state with reasonable certainty the essential terms of the unperformed promises in the contract."[259] While Defendants do not specify the multiple writings they would have the Court rely upon

---

*Delaware* Code, provides essentially four situations in which an agreement must be in writing and signed by the party to be charged in order to be enforceable: agreements for marriage; agreements that cannot be performed within one year; agreements for the sale of land; and agreements to answer for the debt of another.") (emphasis in original).

[256] *Trader v. Wilson*, 2002 WL 499888, at *5 (Del. Super. Ct. Feb. 1, 2002), *aff'd*, 804 A.2d 1067 (Del. 2002) (internal quotations omitted).

[257] *Borish*, 655 A.2d at 834 ("All four types of agreements specified in [S]ection 2714(a) must therefore be in writing and signed by the party to be charged to be enforceable, regardless of whether they can be performed within one year. The legislature specified that each of these agreements must meet certain requirements to be enforceable. To hold otherwise would be contrary to the expressed legislative intent.").

[258] Defs.' Answering Br. 7 (citing *Olson v. Halvorsen*, 982 A.2d 286, 293 (Del. Ch. 2008), *aff'd*, 986 A.2d 1150 (Del. 2009)).

[259] *Olson*, 982 A.2d at 293.

to invoke this exception, I presume they rest their argument, again, on the CertiSign and CertiSign Brazil financial statements and general ledgers and CertiSign's tax returns.[260] These writings, if one can characterize them as such, are not what our law requires to satisfy the statute of frauds by presenting "multiple writings."

In *Olson v. Halvorsen*, the case upon which Defendants principally rely to defeat CertiSign's statute of frauds defense, the "writings" at issue were a signed and an unsigned agreement.[261] There, the Court's multiple writings analysis centered on whether the signed agreement sufficiently referenced the unsigned agreement such that the unsigned agreement could be excepted from the statute of frauds.[262] Here, however, there are *no* agreements—no signed agreement, no draft agreement, no unsigned agreement. That is precisely the problem.[263]

---

[260] *See* Defs.' Opening Br. 33 ("the assumption was evidenced by both companies' financial statements and general ledgers . . . CertiSign also certified in its U.S. tax returns that the assumption occurred").

[261] *Olson*, 982 A.2d at 289.

[262] *Id.* at 293.

[263] *Id.* at 294 (declining to find that an unsigned operating agreement met the multiple writings exception because there was no "clear and specific reference in a signed writing to the unsigned [] operating agreement," and further declining to find that tax returns and annual statements were sufficiently clear reflections of an agreement to constitute a "writing" as contemplated by the statute of frauds).

Before leaving the statute of frauds, I pause to consider whether any other

exception might apply here. In my view, the only potentially applicable exception

is detrimental reliance.[264] As explained in Professor Williston's treatise:

> When the plaintiff has acted to its detriment solely in reliance on an oral
> agreement, the defendant may be estopped to assert the defense of the
> Statute of Frauds. This is based on the principle established in equity,
> and applying to every transaction in which the Statute is invoked, that
> the Statute of Frauds, having been enacted for the purpose of preventing
> fraud, may not be made an instrument for shielding, protecting, or
> aiding the party who relies on it in the perpetration of a fraud or in the
> consummation of a fraudulent scheme. It is called into operation to
> defeat what would be an unconscionable use of the Statute and guards
> against the utilization of the Statute as a means for defrauding innocent
> persons who have been induced or permitted to change their position in
> reliance on oral agreements within its operation.[265]

---

[264] Defendants erroneously proffer part performance and performance within a year as applicable exceptions to the statute of frauds. Defs.' Answering Br. 8–9. As to the part performance doctrine, "[i]t has generally been said that the Doctrine of Part Performance is not applicable to provisions of the Statute other than the one relating to real estate." 10 Williston on Contracts § 28:8 (4th ed.). *See also CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *17 (Del. Ch. Apr. 21, 2015) ("Part performance is a well-recognized exception to the Statute of Frauds for contracts involving interests in land."); *CSH Theatres*, 2015 WL 1839684, at *17 n.84 ("Indeed, the part performance exception applies only to oral contracts involving interests in land."); *Hionis v. Shipp*, 2005 WL 1490455, at *5 (Del. Ch. June 16, 2005) (same), *aff'd*, 903 A.2d 323 (Del. 2006). The "performance within a year" doctrine fails per 6 *Del. C.* § 2714(a). *Borish*, 655 A.2d at 834 ("All four types of agreements specified in section 2714(a) must therefore be in writing and signed by the party to be charged to be enforceable, regardless of whether they can be performed within one year.").

[265] 10 Williston on Contracts § 27:16 (4th ed.). *See also Walton v. Beale*, 2006 WL 4763946, at *4 (Del. Ch. Jan. 30, 2006) (finding detrimental reliance on an oral contract to buy land where plaintiff "paid $20,000 in earnest money . . . and has paid what he believes were property taxes on [the] lots" for several years).

Here, Defendants do not attempt to explain how SK Holdings was "induced . . . to change [its] position in reliance on [the] oral agreement [for CertiSign to assume the Debt]."[266] Rather, Defendants' argument with regard to detrimental reliance comprises exactly one sentence and lacks any reference to facts in the record.[267] This is not surprising, however, given that the record reveals that SK Holdings was content to refrain from seeking repayment of the Debt starting from when the loan was made in 2002 up until 2012.[268] By then, Kulikovsky's relationship with his CKS partners had soured and he raised repayment of the Debt as a condition to offering his cooperation to effect the Self-Help.[269] There was no detrimental reliance here.

Nor does the record support the conclusion that SK Holdings' forbearance was fraudulently induced. Rather, the evidence reveals that the parties considered and then pursued an effort to have CertiSign assume CertiSign Brazil's debt. That effort, by all accounts, was well intentioned. It simply fell short of producing an

---

[266] 10 Williston on Contracts § 27:16 (4th ed.).

[267] Defs.' Answering Br. 8 ("SK Holdings detrimentally relied on the assumption by foregoing collection of the Debt from CertiSign Brazil, a forbearance reflected on CertiSign Brazil's financial statements.").

[268] *See* Tr. 69–70, 84–86, 98, 152–53 (Kulikovsky).

[269] Tr. 69–70; JX 252 at 21 ("[Kulikovsky] admits that he was unwilling to support the 'self-help' process unless the Board ratified . . . the warrant issued to CKS, options issued to certain senior executives and [the] [D]ebt owed to SK Holdings.").

enforceable agreement. Accordingly, I am satisfied that the detrimental reliance exception to the statute of frauds does not apply because the record is devoid of any suggestion that SK Holdings relied on an oral agreement that CertiSign would assume the Debt or that CertiSign or CertiSign Brazil engaged in any sort of fraudulent inducement.

Having found that Defendants have failed to prove that an enforceable contract exists pursuant to which CertiSign assumed the Debt, I reject the request for specific performance or damages on the Debt.[270] Nor will the Court employ

---

[270] JX 258 ¶ 51; PTO ¶¶ 70, 113–14; Pretrial Br. of Def./Counterclaim Pls. Sergio Kulikovsky & SK Int'l Hldgs, LLC 3. Although not ultimately relevant to my decision, I cannot help but observe that CertiSign's protestation that it cannot, as a matter of Brazilian law, assume and repay the Debt is not convincing. As I understand the Brazilian law experts' testimony at trial, both ultimately acknowledged that the failure to register the Debt with the Brazilian Central Bank does not prevent repayment. Tr. 838 (Junqueira), 943–44 (Fernandes). According to Junqueira, the assumption of a Brazilian company's debt by a foreign company is not a foreign exchange contract governed by the Brazilian Central Bank that would require registration with that bank. Tr. 833 (Junqueira). While Fernandes disagreed, he conceded that the failure to register the Debt does not prevent the debt from being repaid if the proper regulatory procedures are followed. Tr. 944 (Fernandes). Specifically, both experts agreed that the party responsible for registering the Debt, CertiSign Brazil, could pay a fine, which would then allow CertiSign to assume and repay the Debt. Tr. 847, 911, 916–17 (Junqueira); 976–77 (Fernandes). According to Junqueira, CertiSign Brazil's fine burden if it registered the Debt at the time of trial would have been approximately R$125,000, or $40,000 USD. Tr. 848–49 (Junqueira). Moreover, the Brazilian Central Bank has five years to charge a fine, so it may well be that the statute of limitations on any fine has already expired. Tr. 844 (Junqueira), 937 (Fernandes). Under these circumstances, it is clear to me that CertiSign Brazil and CertiSign could figure out a way to get the Debt repaid if they were inclined to do so. That they are not is, no doubt, frustrating to Kulikovsky and highly disappointing to the Court. Unfortunately, for the reasons stated, I cannot find that a valid debt assumption occurred here and I have no jurisdiction over CertiSign Brazil to compel it to pay what it owes to SK Holdings.

Section 205 to force a debt assumption upon CertiSign to which the necessary parties never agreed. This is not a case for validation, again, because there was no defective corporate act to validate.[271]

## D. Damages and Interest

As a remedy for Kulikovsky's breach of fiduciary duty, CertiSign seeks to recover the legal fees and expenses it incurred while attempting to implement the Self-Help, while prosecuting the Section 205 Action and while defending the Counterclaims in the present action.[272] It also seeks "pre-judgment and post-judgment interest on a compounded basis."[273]

"[T]he scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[274] "The strict imposition of penalties under Delaware law are designed to discourage disloyalty."[275] In general, "damages must be logically and reasonably related to the harm or injury for which compensation is being

---

[271] *Numoda*, 2015 WL 402265, at *7 (citing 8 *Del. C.* § 205(b)(8), (b)(10)).

[272] Pl.'s Pre-Trial Br. 16; Pl.'s Opening Br. 39–40; Pl.'s Answering Br. 18.

[273] PTO ¶ 108.

[274] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). *See also id.* at 444 (finding breach of "fiduciary duties and that damages flowing from that breach are to be liberally calculated").

[275] *Thorpe*, 676 A.2d at 445.

awarded." [276]    With that said, "[c]oncerns of equity and deterrence justify 'loosen[ing] normally stringent requirements of causation and damages' when a breach of the duty of loyalty is shown."[277]

CertiSign asserts that if Kulikovsky had simply signed the director consents, then litigation would have been avoided because the Self-Help would have corrected the Company's defective capitalization and board issues, CertiSign ultimately would have agreed to issue to Kulikovsky the options he seeks and CertiSign also would have agreed to assume the Debt.[278]  According to CertiSign, Kulikovsky should not receive any credit for his June 2014 "surrender," given that CertiSign's only viable remedial option at that point was to file and prosecute the Section 205 Action.[279] Thus, CertiSign seeks all fees and expenses it incurred related to the Self-Help and related litigation, as well as "two-thirds of the total fees and expenses [it incurred in this action], which represents the fees and expenses incurred" in defense of the Counterclaims.[280]

---

[276] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

[277] *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 262 (Del. Ch. 2006) (citing *Thorpe*, 676 A.2d at 445).

[278] Pl.'s Opening Br. 39–40.

[279] Pl.'s Answering Br. 15–16.

[280] Pl.'s Opening Br. 40–41 n.25; Pl.'s Answering Br. 19–20.

Defendants, by contrast, argue that CertiSign may "recover only a fraction" of the fees and expenses it incurred related to the Section 205 Action, and may not recover any fees and expenses incurred in the present action.[281] In this regard, Defendants contend that (1) Kulikovsky should receive some credit for his June 2014 surrender, whereby he expressed his willingness to consent to CertiSign's proposed Self-Help measures without the conditions he had previously imposed; (2) since CertiSign rejected Kulikovsky's surrender, it should "recover nothing more than the cost of preparing and filing the [Section] 205 Petition"; and (3) there is no basis on which CertiSign may recover any fees or expenses it incurred in defending the Counterclaims in this action.[282]

Between March 2013 and December 2015, CertiSign incurred $390,455.20 in legal fees and expenses in connection with remedying its defective capitalization and board issues—including its prosecution of the Section 205 Action.[283] Thereafter, CertiSign incurred $1,249,223.81 in fees and expenses between November 2015 and September 2017 in connection with the prosecution of its breach of fiduciary duty claim and its defense of the Counterclaims in this action.[284]

---

[281] Defs.' Opening Br. 55.

[282] *Id.* at 55, 59.

[283] JX 429.

[284] *Id.* at 2–3.

78

After carefully reviewing the evidence, I award CertiSign damages in the amount of $390,455.20, reflecting all legal fees and expenses incurred by CertiSign in connection with its efforts to remedy its defective capitalization and board issues after March 18, 2013, the date on which Kulikovsky first imposed self-interested conditions on his cooperation in effecting the Self-Help.[285]  Such fees and expenses are "logically and reasonably related to the harm or injury" for which CertiSign seeks compensation; namely, Kulikovsky's self-interested sabotage of CertiSign's Self-Help process to remedy its capitalization defect and board issues.[286]

Kulikovsky's refusal to sign the Self-Help documents made it impossible for CertiSign to remedy its defective capitalization and board issues without judicial intervention.  By the time of his "surrender" in June 2014, Kulikovsky was no longer on the CertiSign board and, therefore, no longer in a position to facilitate CertiSign's Self-Help process.  At that point, with the need for judicial intervention obvious to all, Kulikovsky could have chosen to consent to the relief sought in the Section 205 Action, as requested by CertiSign prior to initiating the action, or he could choose to fight.  Consistent with his pattern of self-interested recalcitrance, he chose to fight.  In doing so, he passed on the opportunity to contain the Section 205 litigation expenses caused by his breach.  CertiSign was required to respond to Kulikovsky's

---

[285] *Id.* at 1.

[286] *J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 773.

counterclaims—which dragged the distinct issues of option grants and Debt assumption into the Section 205 Action—and then to litigate a contested motion for judgment on the pleadings. Not surprisingly, Vice Chancellor Noble granted CertiSign's motion, validated the capital structure and directed that the Counterclaims should be litigated separately. This was an entirely predictable result given the urgency of the issues presented in CertiSign's petition and the peripheral nature of the issues relating to the option grants and Debt assumption. Under these circumstances, it is entirely reasonable, indeed necessary, to compensate CertiSign for all fees incurred leading up to and in connection with the Section 205 Action.[287]

Compensation to CertiSign for its need to defend claims that Kulikovsky would have brought in any event, however, is not warranted. Those fees and expenses are not "logically and reasonably related to the harm or injury" that CertiSign suffered as a result of Kulikovsky's breach of fiduciary duty.[288] Indeed, Defendants have presented legitimate disputes relating to the alleged option grants and the Debt assumption. That Defendants ultimately did not prevail is no basis to award attorneys' fees incurred by CertiSign in defense of those claims. There is no

---

[287] I am satisfied that the amount of the fees incurred by CertiSign leading up to and during the Section 205 Action is reasonable. In this regard, I note that Defendants have raised no meaningful challenge to the amount of the fees billed by any of CertiSign's legal counsel. Thus, as stated, CertiSign is awarded $390,455.20 in damages from Kulikovsky on account of his breach of fiduciary duty.

[288] *J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 773.

contractual or statutory basis for fee-shifting.[289] Nor have Defendants engaged in bad faith by presenting a legitimate dispute for adjudication.[290] Thus, CertiSign's request for fees with respect to its defense of the Counterclaims must be denied.

As for the interest calculation, "prejudgment interest in Delaware cases is awarded as a matter of right, [and] the general rule is that interest accumulates from the date payment was due the plaintiff."[291] The "legal rate of interest has historically been the benchmark for pre-judgment interest."[292] "Subject to the court's discretion, a party is also entitled to post-judgment interest until the date of payment on an amount that includes both the amount of the judgment and the amount of prejudgment interest."[293] "Unless the parties have specified another rate by contract or the court determines that a different rate is warranted by the equities, the statutory

---

[289] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) ("It is beyond dispute that litigants in Delaware are generally responsible for paying their own counsel fees, absent special circumstances or a contractual or statutory right to receive fees.") (internal quotations omitted).

[290] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) ("Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims.") (internal quotations omitted) (alternation in original).

[291] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) (internal quotations omitted).

[292] *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988).

[293] *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *21 (Del. Ch. Sept. 19, 2017). *See also Summa*, 540 A.2d at 409 (stating the Court "has broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied.").

rate of interest governs."[294]  The Court's broad discretion in fixing the interest rate includes the authority to award compound interest,[295] and "compound interest is a more accurate means of measuring the time value of money."[296]

Given the nature of Kulikovsky's fiduciary breach, I award CertiSign pre-judgment and post-judgment interest at the statutory rate, compounded quarterly.[297] Pre-judgment interest shall accrue beginning March 18, 2013, the date of the CertiSign stockholder meeting where Kulikovsky first declined to cooperate with regard to the Self-Help unless his fellow CKS stockholders acceded to his self-interested demands.[298]  Post-judgment interest shall be calculated "on an amount that includes both the amount of the judgment and the amount of prejudgment interest."[299]

---

[294] *BTG Int'l*, 2017 WL 4151172, at *21.

[295] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002) ("[W]e agree with the Court of Chancery that its uncontested 'discretion to select a rate of interest higher than the statutory rate . . . include[es] the lesser authority to award compounding.'").

[296] *ReCor Med., Inc. v. Warnking*, 2015 WL 535626, at *1 (Del. Ch. Jan. 30, 2015) (awarding "interest on the fee and expense award[,] compounded quarterly").

[297] *See id.*

[298] Tr. 322 (Kulikovsky); *see Brandywine Smyrna*, 34 A.3d at 486 ("Prejudgment interest in Delaware cases is awarded as a matter of right, [and] the general rule is that interest accumulates from the date payment was due the plaintiff" or the date of the harm).

[299] *BTG Int'l*, 2017 WL 4151172, at *21.

## III.  CONCLUSION

For the foregoing reasons, judgment is entered in favor of CertiSign on its breach of fiduciary duty claim and on the two Counterclaims.  CertiSign is awarded damages in the amount of $390,455.20, with pre-judgment and post-judgment interest at the statutory rate, compounded quarterly.   Given that Kulikovsky presented a serious dispute, particularly with respect to the Debt, I am satisfied, in this instance, that both parties should bear their own costs notwithstanding Court of Chancery Rule 54(d).[300]

**IT IS SO ORDERED.**

---

[300] *Cf. Consol. Fisheries Co. v. Consol. Solubles Co.*, 112 A.2d 30, 40 (Del. 1955) (confirming that taxation of prevailing party costs under statute analogous to Chancery Rule 54(d) is left to the sound discretion of the trial judge), *modified on other grounds,* 113 A.2d 576 (Del. 1955).